David C. FROST, Appellant,

v.

UNITED STATES, Appellee.

Gavin P. ROBINSON, Appellant,

v.

UNITED STATES, Appellee.

Nos. 91–CM–147, 91–CM–192.

District of Columbia Court of Appeals.

Argued Nov. 3, 1992.
Decided Dec. 30, 1992.

---

Monoranjan Bezboruauh and David W. Windley, appointed by this court, for appellants.

Barbara A. Grewe, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher and Thomas C. Black, Asst. U.S. Attys., were on the brief, for appellee.

Before ROGERS, Chief Judge, and STEADMAN, and SCHWELB, Associate Judges.

ROGERS, Chief Judge:

Appellants David C. Frost and Gavin P. Robinson appeal their convictions of assault, D.C.Code § 22–504 (Repl.1989), on the grounds that the trial judge erred by

proceeding with the trial in the absence of appellant Robinson, and by excluding evidence of the complainant's prior assaultive behavior and the nature of the place where the assault occurred in support of their defense of a third person. We find no error by the trial judge in ruling that Robinson's absence from trial was voluntary, nor an abuse of discretion in proceeding with the trial in his absence. We also find no abuse of discretion in the trial judge's exclusion of evidence. Accordingly, we affirm.

I

■ These appeals arise from an incident in which Oscar Leon was beaten outside a bar by three men—Pelcie Richardson, David Frost, and Gavin P. Robinson—after he was asked by the manager to leave the bar as a result of making threats while inside the bar against Robert Perry, a sixty-four year old man, who worked security at the bar. Based on Leon's identifications, Richardson and appellants were arrested and charged with assault.[1]

Trial for the three defendants was set to begin on Wednesday, January 2, 1991. Richardson did not appear, however, and when he had not appeared by the afternoon session, the trial judge issued a bench warrant for his appearance. In the meantime, that afternoon, Robinson disappeared for several hours. When he returned, the jury was selected, given preliminary instructions, and released until the next day. Before recessing, the trial judge admonished Robinson that if he failed to show up the next morning the trial would continue without him; Robinson signed a notice to appear the next day.[2]

The next day Robinson did not appear, although Richardson did. As the trial was set to begin, the trial judge was informed by the Pretrial Services Agency that Robinson had been placed on escape status the day before from a half-way house where he was being held pending trial. The judge was also advised that the Mayor's Command Center had been unable to locate Robinson in area hospitals or at the jail. The Warrant Squad had been notified and was looking for Robinson. The judge issued a bench warrant and set bond at $10,000.

The trial judge observed that in view of her warnings to Robinson and the signed notice to appear, it appeared that his absence was voluntary.[3] The Corrections Department advised that the information about Robinson had gone out the night before, but his name was still on the list of outstanding bench warrants. Robinson's attorney stated that he knew of no reason why his client was not present. Nevertheless, although concluding that she had the authority to continue in Robinson's absence, the judge decided to take another recess. That afternoon the judge was also informed by a representative of the Department of Corrections that there was no answer at the emergency telephone number that Robinson had given to the Department. She questioned defense counsel about his client's whereabouts, and after

---

1. Frost was held in custody pending trial, Robinson was placed in a half-way house, and Richardson was released on bond.

2. The trial judge stated:

   Mr. Robinson, if you are tardy again, I'm going to lock you up right away. We can't run a trial with—the break earlier today, we had to take a 15–minute recess because you were not here, sir. And I can hold you in contempt and lock you up so that we don't have to wait for you any longer. Do you understand that, sir?

   \* \* \* \* \* \*

   Mr. Robinson, you understand that you must be here tomorrow morning at ten o'clock. And if you are not here, the case can continue in your absence and you could be held on $1000 bond and subject to a one-year penalty. Do you understand, sir?

   Robinson responded that he did, and the judge indicated that he had to sign a notice to appear.

3. When Robinson failed to appear at the afternoon session, the trial judge inquired of Frost whether or not he would agree to a mistrial so he could be tried with Richardson with a new jury. Frost declined. At this point, the trial judge declined to let Richardson participate in the trial as a defendant because the judge was of the opinion that Richardson could not retroactively waive his presence during the selection of the jury. Frost's counsel advised the judge that his client was advised of the impact of going to trial without Robinson being present.

hearing counsel's statement that he had "no idea" where his client was and that Robinson was "basically a homeless person" who wanders around and has a drug problem, the judge decided to recess until the following day.[4]

The next morning, Friday, January 4, the trial judge continued to inquire about Robinson. The Warrant Squad informed the judge of the efforts to locate Robinson; two efforts had been made to serve the warrant at Robinson's home address. The judge also inquired again of defense counsel if he was aware of any circumstances that would indicate an involuntary absence by Robinson. Counsel for Richardson then informed the judge that he had spoken with the manager of the bar, Eugene Roberts, the night before and that Robinson was present at the bar at that time. Richardson's counsel had told Robinson that he should contact his lawyer and the Pretrial Services Agency and that he should arrange to be in court the next day. According to Richardson's counsel, Robinson stated that he had not been in court because he had personal problems to deal with and that he would be present the next day. The manager of the bar, who was present in the courtroom, informed the judge that he had last seen Robinson in the bar the night before at 7 p.m., but he did not know where he was now and did not know of any way to contact him. The judge suggested that the Marshals and the Corrections Department visit the bar to see if Robinson could be found.[5]

The trial judge then concluded:

Given [the co-defendant Richardson's counsel's] conversation which has been repeated this morning with Mr. Robinson, there is no question in the Court's mind that Mr. Robinson was fully aware of his obligation to be here. He was aware of the process; knew that he had a duty to be present. The Court warned him of that duty on Wednesday afternoon.

He's been again been told by his counsel—by Mr. Allen. And nothing he said to Mr. Allen on the phone and nothing that I have heard here indicates any reason for this absence that would make it involuntary.

And the Court finds at this time that this is a voluntary absence by Mr. Robinson without justification and a highly extraordinary conduct. Mr. Robinson was placed in a halfway house knowing full well his obligations, having been warned not only by this Court but by the Department of Corrections.

The judge noted that continuing efforts were being made to find Robinson, but in view of the conversation with the co-defendant's counsel, the judge did not believe that Robinson would voluntarily show up and that hence it was unlikely that the Marshals or the Corrections Department would "be able to find him in a reasonable time." The judge made further findings on the time the jury and witnesses had been waiting, and the right of Frost to go to trial. Deciding that she had waited "more than a reasonable period," the judge ordered that the trial would proceed in Robinson's absence.[6] Trial testimony was then

---

4. The trial judge observed:
   my understanding from yesterday's record is that he was warned, that we could continue this trial in his absence if he *did not* appear. That he was told that he had to appear at ten o'clock this morning, and I also remember telling him perhaps *six times* about the importance of being here at 10:00 because he had caused us a delay in the middle of the trial yesterday.
   He clearly, given the fact that he was previously locked up and then put into a halfway house, was well aware of what was happening here and well aware of his obligation to be present. That is what I understand the present state of affairs to be.

5. At this point, Richardson's counsel advised that his client had changed his mind and was no longer willing to waive his presence at jury selection and would not join the current trial. Frost's counsel reaffirmed that his client wanted to go to trial and would object to "anymore delay requested by the government." The judge, although now of the opinion that Richardson could waive his presence at jury selection, severed his case, and decided to set another date for Richardson's trial.

6. Robinson's counsel declined the judge's offer to instruct the jury on Robinson's absence at this time.

taken, Friday, January 4 until Tuesday, January 8; on January 9, the jury found appellants guilty of assault.

Rule 43 provides that the defendant shall be present at all stages of the trial but that "the further progress of the trial ... shall not be prevented and the defendant shall be considered to have waived the right to be present whenever a defendant, initially present, ... [i]s voluntarily absent after the trial has commenced...." Super.Ct.Crim.R. 43. In *Kimes v. United States*, 569 A.2d 104, 109 (D.C.1989), the court identified the two-part analysis: first, whether the defendant voluntarily waived his right to be present at his trial, and second, whether the trial court abused its discretion in proceeding without the defendant. *See Taylor v. United States*, 414 U.S. 17, 94 S.Ct. 194, 38 L.Ed.2d 174 (1973); *Heiligh v. United States*, 379 A.2d 689, 693 (D.C.1977). On the question of voluntariness, the trial court must conduct an inquiry on the record into the circumstances of the defendant's absence and make findings on whether the absence was voluntary. *Kimes, supra*, 569 A.2d at 110. Because "the trial court's determination of voluntariness is itself a mixed question of fact and law," the court "will defer to the trial court's determination of the underlying facts unless clearly erroneous ... and review the ultimate determination as to voluntariness de novo as a matter of law." *Id.* at 109 n. 6. The record makes clear that the trial judge made the necessary inquiry and findings, and that the trial judge did not abuse her discretion in proceeding with the trial in Robinson's absence.

The trial judge waited a reasonable period before proceeding with the trial without Robinson and conducted a thorough inquiry into the reasons for his absence. The judge had been advised of the efforts by the Pretrial Services Agency, the Mayor's Command Center, the Corrections Department, and the Warrant Office to locate Robinson. In addition, the trial judge twice inquired of defense counsel about where Robinson might be. The judge also learned from Richardson's counsel that Robinson had once again been told to appear, and she also learned from the co-defendant's counsel of Robinson's reason for not appearing. Most importantly, the trial judge had personally warned Robinson more than once that he had to be present in court, and that his trial would continue in his absence, and he had informed the judge that he understood and he had signed a notice promising to appear.

The record further shows that although present at the bar on the night of a date when he had failed to appear in court, Robinson had not contacted the Pretrial Services Agency or his lawyer to explain the "personal problems" that had purportedly kept him from being in court. Nor did he offer any explanation of his absence to the judge when she inquired at the time of sentencing after Robinson pleaded guilty to violation of the Bail Reform Act for failing to appear.[7] *Cf. id.* at 109 (trial court's duty to inquire into defendant's reasons for failure to appear extends throughout period up to sentencing). Thus, the trial judge's findings are supported by the record and not clearly erroneous, and we agree that the record shows that Robinson's absence was voluntary.

■ In addition, we find no abuse of discretion by the trial judge in proceeding with the trial in his absence. *See id.* at 111.[8] The trial judge recessed the trial on

---

7. The following exchange took place at the sentencing between the judge and Robinson:

    THE COURT: Anything you wish to say, Mr. Robinson, at this time?

    THE DEFENDANT: No more than if I knew it was going to get all into this I would have never gotten involved with that.

    THE COURT: One wonders how anyone could start a trial then disappear.

    THE DEFENDANT: True, Your Honor.

    THE COURT: ... Anything you wish to say?

    THE DEFENDANT: No more than what I've said, Your Honor.

8. This question is:

    resolved by considering such factors as the reasonableness of the trial court's efforts to ascertain the defendant's whereabouts, the likelihood that the trial could occur with the defendant present, the burden on the government, witnesses, and jurors if the trial were delayed, and the appellant's interest in being present at the trial proceedings that remained. Id. at 109–10.

several occasions in order to give the government time to locate Robinson and in the hopes that Robinson would return. The judge continued to inquire of Robinson's counsel and relevant agencies about where he might be and the steps that were being taken to locate him. Before proceeding with the trial the judge was advised by the Warrant Squad of the efforts made to serve the warrant, and Richardson's counsel informed the judge of his advice to Robinson the night before and of Robinson's response. These were reasonable efforts by the trial judge, and hardly perfunctory, as Robinson suggests.

Furthermore, the record indicates the potential burden on the government, witnesses and jurors had the trial been further delayed. The jury had been impaneled the day before Robinson failed to appear, and the witnesses for the government had been present for two days. Frost had been incarcerated for two and a half months, and he was asserting his right to a speedy trial, while Richardson declined to join a trial where he had not been present for the selection of the jury. Although Robinson had a clear interest in being present in order to present his defense, jeopardy had attached to appellant Frost. The judge's decision to proceed under these circumstances was within the range of permissible alternatives. *See Johnson v. United States*, 398 A.2d 354, 365 (D.C.1979).

■ Appellant Frost's claim of prejudice is unpersuasive. He contends that he was prejudiced by continuance of the trial in the absence of the two other persons alleged to have assaulted the complainant because "the jury held these absences probably as indicia of guilt." He asserts that because of the threats to his person and property while he was incarcerated, in the absence of "sympathy toward the Defense motions

for modifications of release, it was normal for the Defendant to insist on continuing with the trial despite the unusual absences of the co-defendants."[9] The trial judge instructed the jury to consider evidence against each defendant separately, and also instructed the jury that it was not to draw any negative inference as a result of the absence of Richardson and the absence of Robinson. In view of Frost's insistence on going to trial, after being advised of the effect of proceeding in Robinson's absence, and Richardson's refusal to join the trial, the judge had virtually no alternative except to proceed without Robinson. Hence, as the government suggests, Frost's suggestion that the trial should have been continued until all three defendants were present and he should have been released in the meantime, is unpersuasive.

## II

Appellants also contend that the trial judge erred by excluding evidence of the complainant's prior assaultive conduct and the nature of the bar in support of their defense that they were acting to defend a third person. Frost argues that such evidence was necessary "to make the picture whole" before the jury. Robinson maintains that a reverse *Drew*[10] and *Toliver*[11] analysis is appropriate and that the government was not entitled to sanitize the circumstances surrounding the assault. Further, he contends that the government opened the door to an explanation of what was meant when the complainant testified that he was told by Richardson to "leave the old man alone."

### A

Before trial, the government made a motion in limine to suppress any testimony

---

**9.** The government suggests that Frost has no standing to complain since his defense was that he had not been involved in the assault, and in the absence of any certainty that Robinson would waive his Fifth Amendment privilege, Frost could only speculate that Robinson's presence would have helped him at trial. But, Frost argues that he was prejudiced because he had to

testify and the jury thereby learned of his "past convictions as well as his lack of a job and a place to stay."

**10.** *Drew v. United States*, 118 U.S.App.D.C. 11, 331 F.2d 85 (1964).

**11.** *Toliver v. United States*, 468 A.2d 958 (D.C. 1983).

having to do with prior threats allegedly made by Leon toward people in the P Street Bar.[12] Defense counsel indicated that their defense was "self defense of a third person," and that they intended to elicit such testimony on direct examination of Perry, and the manager of the bar, Eugene Roberts. In particular, the defense intended to show that four nights earlier, Leon had been in the bar, which was frequented by homosexuals, with a male date, and Perry had helped the date leave the bar without being seen by Leon, and upon learning what had happened Leon had threatened Perry and Roberts. Defense counsel also sought to show that on the following nights Leon had come to the bar and made threats. The prosecutor argued the past behavior was not relevant to a claim of self defense due to "lack of proximity and time and location." The trial judge deferred ruling on the motion until hearing evidence. Thereafter, the trial judge granted the government's motion to suppress evidence of the prior assaultive conduct on the ground that the evidence failed to show a basis for a self-defense or defense of third person claim.

The key government witness was Leon.[13] He testified that he had arrived at a bar, known as the P Street Station, on the corner of 22nd and P Streets, N.W., after midnight on October 28, 1990. He consumed two beers over a one and one-half hour period. As he left the bar at 2:45 a.m., he was confronted at the door by appellant Frost, who asked for money for a beer. Leon told him to "get out of my face" and began walking east on P Street toward Dupont Circle. Upon reaching approximately the middle of the block on P Street between 22nd and 21st Streets, Rich-

ardson, who worked at the bar, came up behind him and upon turning around, Leon heard Richardson say something about "Leave the old man alone." [14] Leon claimed that he thought that Richardson was referring to an employee at the bar but he was unsure which employee Richardson had in mind.

Leon began looking for the police because he thought that Richardson was acting as though he was about to attack Leon. Leon then saw Frost and Robinson, who also worked at the Bar, on the other side of the street, walking toward him; Frost had a metal object in his hand. Leon looked back at Richardson, and then back at Frost and Robinson, and then back at Richardson. Richardson hit Leon on the right side of the face, and Robinson hit Leon on the left side of his face. Someone else hit Leon from behind with a heavy object, and when Leon turned around he saw Frost, who also begin hitting him with his fists. The attack lasted about a minute. Leon heard Richardson say "kill him."

Leon denied doing anything to provoke the attack, and claimed that there was no reason for the men to attack him. After a number of blows he yelled for help and ran across P Street. A security man from another bar took Leon inside, and put ice on his face. Later, the police arrived. Leon told the police that he did not know why the men had beaten him.

Eugene Roberts, the owner and manager of the P Street Station Bar, testified for the defense. He confirmed that Leon was in the bar on October 27–28, but painted a different picture of events. According to Roberts, Leon had posed a threat to the

12. The assault on Leon occurred in the early morning hours on October 28, 1990. The government's motion was limited to threats and assaultive conduct that occurred prior to the evening hours of October 27, 1990.

13. The government's other witnesses were police officers who arrived after the fight was over. One officer testified that, after he had responded to the radio call, a man had told him that a "whole group of people were beating up somebody," "beating him up, almost killed him." The police officer also saw that Leon's face was swollen, and his lips were bleeding a

little. A second officer testified that Leon had knots on his face, a knot on the back of his head, bruises, and swollen lips. Leon declined to go to the hospital.

14. When Leon testified that Richardson had said "Leave the old man alone," Frost's counsel argued that the government had opened the door to testimony about Leon's prior conduct, and Robinson's counsel argued that his client was entitled to a self-defense instruction and an instruction on defense of third persons.

security personnel (Perry, Richardson and Robinson) of the bar, and in particular to Perry. Roberts testified that Leon, throughout the time he was in the bar that night, was hitting his thumb to his fist, and repeatedly saying to Perry, the security guard on duty, "I will get you." Roberts also testified that Leon had grabbed Perry by the lapels, shaking him and saying "I will get you. I will be waiting for you outside." Roberts testified that he thought Perry's life was in danger from Leon. Although not on duty that night, Robinson and Richardson were also present in the bar at the time Leon was making these threats, about which Robinson knew. Roberts had asked both men to watch Perry when he left in order to make sure that he got into a cab without any threats to his life. Leon also threatened Roberts. Roberts testified that Leon was asked more than once to leave the bar, and left reluctantly.

Officer Haworth, testifying as a defense witness, stated that one of the police reports included a statement by Robinson that Leon "had threatened an employee of the P Street Station earlier this morning and he was protecting the employee." [15] Another report indicated that only fists were used during the fighting, and that Leon had not claimed he was hit with a bicycle lock, which Frost was holding at the time of his arrest. None of the defendants had suffered any cuts or bruises.

Frost also testified, denying that he was involved in any way in the assault on Leon. Frost was standing outside of the bar when Leon exited, and Leon had been rude to him when he had asked Leon for money as he was leaving the bar. Richardson, who had escorted Leon out of the .bar, told Frost that Leon was giving Perry a hard time and to be sure Leon walked away from the bar. According to Frost, Leon looked as though he had just been in an argument and was in a bad mood. Frost knew it was "their responsibility to escort people out of the bar when they're acting violent or in a rude way."

Frost then heard some screaming—Leon using vulgar language towards Richardson—and as he starting walking towards them, they began fighting. Frost turned away because he did not want to become involved. He described Leon as being aggressive and quite "pushy" toward Richardson, and indicated that Robinson was also involved in the fighting. Frost said that the fight took place in front of an apartment building at 2121 P Street.[16] He admitted that he, Richardson and Robinson all care for Perry, and that he did not see Perry outside of the bar.[17]

Perry testified that he only knew Leon as a patron of the bar. He testified that Leon had threatened him inside the bar, pounding his fist into his hand and pointing

15. Over government objection, the trial judge allowed the statement into evidence even though it was hearsay because Robinson was absent from the trial.

16. As to the location of the fighting, Frost said it occurred in front of 2121 P Street, an apartment house. Between that building and the P Street Station Bar was a liquor store, shoe place, a market, and another bar; the Olney Georgetown Hotel was on the other side of the apartment house.

17. Out of the presence of the jury, Frost testified that Richardson and Robinson had told him about the prior incident, several days earlier, with Leon. He claimed that Robinson, who had come from behind him from the direction of the bar approximately a minute after the fighting began, was involved in the fighting "[f]or a brief moment" in a "push and shove, whatever, match." Frost denied knowing who had struck the first punch when Richardson and Leon began fighting after exchanging words; nor did he see who swung first as between Robinson and Leon. Frost did not see Perry anywhere in the immediate vicinity of the fighting.

Frost testified that Leon "was trying to go back inside the bar many times." He described Leon's effort to reenter the bar after being escorted out by Richardson. After Leon had walked only five to ten feet up the street, he turned back and was prevented from reentering the bar by Richardson, who said "You can't come in the bar." There was no exchange of blows at this point. Leon then began walking up the street again toward Dupont Circle, and got "three quarters of the distance there between 2161 and 2121," "almost all the way by 2121," "maybe 30 feet, if that," when Richardson began following him. Frost did not know whether Leon had changed his course or direction and starting going west, toward the bar, a second time.

at Perry as though he had a gun, and saying he was going to get him, make him pay. When the manager asked him to leave the bar, Leon grabbed Perry's coat lapels and shook him. Perry also asked Richardson and Robinson to watch him and wait for him when he left the bar. Perry testified that he remained inside of the bar until after the fighting outside was over. On cross-examination by Frost's counsel, Perry explained that he had asked Robinson to assist Richardson in restraining Leon from reentering the bar. Perry had told Robinson that Leon was harassing him and also asked Robinson to keep an eye on Leon while he was in the bar. He explained that anyone would be afraid of Leon when he was acting in a hostile manner. On cross-examination by the government Perry explained that it had not been necessary to call the police when Leon had grabbed his lapels since other people "rushed to my assistance." Later, when the police arrived after the fighting outside, Perry told them that Leon had been causing trouble most of the evening.

### B

We find no abuse of discretion by the trial judge in refusing to admit evidence of the complainant's prior assaultive conduct. *See generally United States v. Mosby*, 495 A.2d 304 (D.C.1985) (broad discretion of trial court to determine relevant evidence).

■ Appellant Robinson's contention of evidentiary error is directly tied to his claim that his defense was defense of the third person. "When it comes to determining whether force is reasonably necessary to defend a third person under attack, the focus ultimately must be on the intervenor's, not the victim's, reasonable perceptions of the situation." *Graves v. United States*, 554 A.2d 1145, 1147 (D.C.1989) (citing *Fersner v. United States*, 482 A.2d 387, 392 (D.C.1984)). In order to prove that he had the right to use force in defense of Perry, Robinson had to show that he reasonably believed and actually believed that Perry himself had a right of self-defense. *Fersner, supra*, 482 A.2d at 390 (citing

*Taylor v. United States*, 380 A.2d 989, 994–95 (D.C.1977)); *Mitchell v. United States*, 399 A.2d 866, 869 (D.C.1979). In addition, where deadly force is used in self-defense, the defendant must prove that at the time of the incident, he or she actually and reasonably believed that he or she was in imminent danger of death or bodily harm. *McPhaul v. United States*, 452 A.2d 371, 373 (D.C.1982). When nondeadly force is used, the defendant must show that he or she reasonably believed that the harm was imminent. *Id.*

■ There was no evidentiary basis to support a claim by Robinson that he reasonably and actually believed that Perry had a right of self-defense at the time of the fighting on the street. Although the manager of the bar testified adversely about Leon's conduct inside the bar, and although Frost's testimony indicated that Leon was acting in an aggressive manner toward Richardson, neither this testimony, nor Perry's testimony that Leon in a hostile mood would be frightening, was sufficient to show that Perry was in imminent physical danger from Leon once Leon had left the bar and been denied reentry. The evidence before the trial judge was that Richardson had successfully prevented Leon from reentering the bar, and Leon was walking away from the bar at the time that Richardson decided to follow him. Moreover, the uncontroverted evidence established that Perry had been inside the bar during the entire time the assault outside was taking place.

Appellants argue that what happened was a continuation of ongoing events with no time for a cooling-off period, but the record does not support the necessary inference of imminent danger. While there was evidence that Leon may have harbored animosity toward Perry after he left the bar, by the time the fighting started Leon was halfway down the street while Perry was still inside the bar. Roberts (the manager of the bar) did testify that he thought Leon threatened Perry's life, but Roberts' own evaluation of the threat revealed that

he did not think it was imminent. Roberts did not call the police at the time Leon was threatening Perry inside the bar, or even after Leon grabbed Perry by the lapels and shook him. He explained that it was near closing time at the bar and that he had told Robinson and Richardson to keep an eye on Leon. Roberts also denied that he had told Richardson and Robinson to go after Leon. Similarly, Frost's testimony, that he turned away from the fighting and did not want to become involved, confirmed Leon's testimony that he was almost half-way up the block before the fight broke out and hardly supports an inference that Frost perceived any imminent harm to Perry from Leon.

While it is possible that Robinson or Richardson could have provided such evidence had they testified (after Richardson's own trial was over), each appellant thwarted such an option. Frost demanded that his trial proceed even though he knew that Richardson's trial had been postponed and that his codefendant Robinson was not going to be present. Robinson was voluntarily absent from his own trial. Other witnesses to the fighting might have provided a basis for the necessary inference, but no such witnesses were presented. Likewise, Robinson's contention that the evidence about the prior assaults should have been admitted because he was not present at trial to testify about it himself is without merit; it assumes that the trial judge would have changed her ruling that the evidence about prior assaultive conduct was not relevant, and on this record there is no basis for such an assumption.

Nor can Robinson successfully argue that he was lawfully defending Richardson. As noted, for Robinson's claim of defense of a third person to succeed, he would have

to demonstrate, among other things, that he reasonably believed that Richardson had a right to self-defense. *Fersner, supra,* 482 A.2d at 390. All the evidence introduced at trial, however, tended to indicate otherwise. According to the testimony, it was Richardson who pursued Leon up the street, a fact which clearly undercut the argument that Richardson had a right to self-defense. *See Harper v. United States,* 608 A.2d 152 (D.C.1992) (defendant properly denied a self-defense instruction where she shot alleged robber whom she had followed out of the store and up the street, and thus "put herself in a position that was likely to result in an escalation of tensions, ... and used deadly force against a man whose empty hands were in plain view"). There was no evidence to suggest that Richardson was in need of assistance or that Robinson thought he was. *Cf. Jones v. United States,* 555 A.2d 1024, 1027 (D.C.1989) (error not to give defense of third person instruction where defendant had come upon the scene and witnessed what appeared to him to be an assault, robbery, and choking in progress). According to Officer Haworth, none of the defendants had any bruises after the fighting. Frost's testimony that he turned away from the fighting further undercuts any inference that Richardson needed to be defended. Although Leon was big, Perry testified that he thought Leon looked fat, and described Leon as "tall and chubby, not muscular." By contrast, Richardson was six feet five inches tall. Robinson's statement to the police, moreover, indicates that he joined the fighting in order to protect Perry, not Richardson. We, therefore, conclude that Robinson failed to offer "any evidence, however weak,"[18] to show that

---

**18.** A defendant "is entitled to a jury instruction on any issue fairly raised by the evidence, ... 'however weak' that evidence may be," *Carter v. United States,* 531 A.2d 956, 959 (D.C.1987) (citations omitted), as long as a reasonable juror could credit the evidence. *Goddard v. United States,* 557 A.2d 1315, 1316 (D.C.1989). The trial judge may properly refuse to give an instruction where no factual or legal basis for it exists, *Carter, supra,* 531 A.2d at 959; *Goddard, supra,* 557 A.2d at 1316, and in reviewing the

denial of a requested defense instruction, the court examines the evidence in the light most favorable to the defendant. *Adams v. United States,* 558 A.2d 348, 349 (D.C.1989) (citing *Richardson v. United States,* 131 U.S.App.D.C. 168, 169, 403 F.2d 574, 575 (1968)). Although the instruction need not be given exactly as suggested, the failure to give such an instruction where some evidence supports it is reversible error. *Graves, supra,* 554 A.2d at 1147.

he reasonably and actually believed Perry was in imminent danger and thus, that a defense of third person could properly be raised.[19]

In addition, neither appellant presented evidence that would have entitled them to an instruction on self-defense.[20] Although there was evidence that Frost and Robinson knew of Leon's assaultive conduct toward Perry in the bar earlier that night, no evidence suggested that either appellant was the object of Leon's assaultive conduct. *See McBride v. United States*, 441 A.2d 644, 653 (D.C.1982); *United States v. Akers*, 374 A.2d 874, 877–78 (D.C.1977). Consequently, they cannot rely on the authority that evidence of the complainant's prior assaultive conduct should have been admitted. *See, e.g., McBride, supra*, 441 A.2d at 652 ("If a defendant raises a claim of self-defense ... both communicated and uncommunicated threats bear on the question whether the complaining witness or the defendant was the aggressor").

The trial judge could also reasonably conclude, in the exercise of her sound discretion, that the government's evidence was not unduly sanitized, as Frost maintained. Even if the evidence relating to Leon's foiled date four nights earlier and its aftermath would have provided the jury with a better understanding of the events of October 27 and 28 by allowing the jury to see the full mosaic of the genesis of the hostile relationship between Leon and Perry, the evidence before the jury reveals that Leon was not simply an innocent victim, entirely without fault, whereas Perry was the innocent victim of Leon's abuse. The three defense witnesses—Roberts, Frost and Perry—provide testimony unfavorable to Leon and his version of events, and clearly called into question Leon's credibility when he denied knowing to whom Richardson was referring when he told Leon to "leave

the old man alone." There was no issue before the jury relating to Leon's intent as to Perry, and the trial judge could reasonably conclude that surrounding circumstances beginning four nights earlier were peripheral to the issues at trial. Furthermore, to the extent that the defense claimed that Leon's testimony, that Richardson had told him to "leave the old man alone," "opened the door," the defense offered evidence identifying who was the object of Leon's wrath. Moreover, appellants' contention that evidence of Leon's prior assaultive behavior should have been admitted for the purpose of impeachment is without merit. *See Akers, supra*, 374 A.2d at 878 (evidence of unlawful assaultive attacks may not be used to impeach as the crime of assault does not involve dishonesty or false statement) (citing *Williams v. United States*, 337 A.2d 772 (D.C.1972)).

Finally, the trial judge could reasonably conclude that evidence regarding the nature of the bar was of little, if any relevance. As the trial judge found, the fight did not erupt over something regarding homosexuality or the nature of the bar, and hence, evidence that the bar was frequented by homosexuals would have added nothing relevant to the evidence before the jury. Appellants' argument at trial, that this evidence was relevant to the amount of force used because the level appropriate in a "heterosexual-type place" might be different from that at a homosexual bar, was properly rejected by the judge on the grounds that this circumstance did not permit a greater amount of force to be used. As to appellants' argument that the evidence was relevant to show that a homosexual bar was perhaps a "rowdy" place, nothing in the trial judge's ruling prevented appellants from introducing evidence that no food was served in the bar, that people in the bar tended to drink a lot, and

---

**19.** Necessarily, therefore, the trial judge did not err in denying Robinson's request for an instruction on defense of a third person.

**20.** Hence, the judge did not err in denying the request for a self-defense instruction.

that it was generally a rowdy place.[21]

Accordingly, we affirm the judgments.

---

**21.** Appellants also contend that the trial judge erred by refusing to admit evidence regarding the complainant's sexual orientation because his status as a homosexual and presence at a gay bar was admissible as prior bad acts and impeachable offenses on the basis that he must have been committing the crime of sodomy. We find no abuse of discretion by the trial judge in concluding that, in the absence of proof that Leon had been convicted of any such felony, evidence of his sexual orientation was irrelevant to the issue of whether an assault occurred.