Ferguson v. Electric Factory Concerts

*Bruce J. McKissock,* for plaintiff.

*Robert D. MacMahon,* for defendants Electric Factory Concerts Inc. and Clear Channel Communications.

*Catherine S. Straggas,* for defendant National Event Services Inc.

*Andrew J. Kramer,* for defendant Phillies, a/k/a Citizens Bank Park.

MASSIAH-JACKSON, *J.,* March 19, 2009—On September 9, 2008, following a five-day jury trial, defendants Electric Factory Concerts Inc., National Event Services Inc. and the Phillies were found liable for the injuries suffered by the plaintiff, Greg Ferguson. (All other defendants on the caption were dismissed from the case.)

The jury awarded Mr. Ferguson $150,000 and determined that Electric Factory Concerts Inc. was 10 percent negligent, and, National Event Services Inc. was 60 percent negligent, and, the Phillies was 30 percent negligent. Plaintiff-Ferguson was assaulted by a loud, disorderly and belligerent man while he was attending a Jimmy Buffett concert at Citizens Bank Park. The plaintiff suffered serious and permanent injuries.

After trial transcripts were received, a post-trial briefing schedule was arranged by counsel and the court. The parties agreed to waive oral argument. For the reasons which follow all of the defendants' motions for post-trial relief are denied.

## A. BACKGROUND OF THE CASE

Electric Factory Concerts Inc. (EFC) promoted the Jimmy Buffett concert on August 27, 2005 at Citizens Bank Park. The Phillies organization holds the long-term lease of Citizens Bank Park for their baseball games. In addition, the Phillies generate income and revenue by hosting events such as concerts at the ball-park. The Phillies arranged for National Event Services Inc. (NES) to provide crowd management and event staffing for the August 2005 concerts. NES billed EFC for two Jimmy Buffett events (August 25 and 27) totaling $77,927.26. NES was paid by EFC, the concert promoters. There were more than 45,000 people in attendance at Citizens Bank Park on August 27, 2005. This was the first concert sponsored by the Phillies at Citizens Bank Park. EFC, NES and the Phillies have long-standing working relationships at many events and at various venues along the east coast. NES and EFC have worked together for other Jimmy Buffett concerts. The Phillies and NES have worked together for Phillies baseball games. See Toben, September 3, 2008, N.T. 80-90; Monzo, September 3, 2008, N.T. 147, September 4, 2008, N.T. 19-20.

Carl Monzo, the president of National Event Services, described the "typical" Jimmy Buffett crowds on September 4, 2008, N.T. 46-48, at N.T. 47:

"People come in and they are in a festive, just a whole festive involvement. And everything about Jimmy Buffett and Margaritaville and his different songs and his restaurants. It all has that island feeling. And the people come dressed.

"If you ride by the parking area of a Jimmy Buffett concert, you see flags up and blowup animals and palm trees and you name it. I have even seen them put sand down in the parking lot and make their little tailgating party on the sands they build up."

The jury also heard Frank Lynch, the NES director of operations, explain at September 8, 2008, N.T. 51, describe the "Buffett crowd":

"Jovial. Like I said, it's the feel-good tour of the summer. Prior to King Chesy, which like Country Rocks, it's that. That's exactly what it is. It's the Caribbean. It's leave your troubles behind. It's wading pools. People come in trucks, they put liners in their trucks and they fill their pickup trucks with water. I don't know how the Phillies provide enough power for all the blenders and things going on in the parking lot. It's just leave-your-cares-behind day.

"95 percent of them aren't in their seats. They are dancing or singing, they're ready. I mean when that concert is ready to go, they are ready. . . .

"If you are not in your seats by two or three songs, you are not a Buffett fan. I mean, everyone is in; there is no one outside. And it's electric. It's electrifying. The crowd, it's amazing. It's a touchdown at the Eagles game, it's a home run at the Phillies field, everybody is ampted."

There should not be any misunderstanding that throughout the trial when any witnesses or counsel used the words "party mood" or "party atmosphere" or "festive" or "jovial" or "tailgating," the references relate to patrons and concert goers who were drinking alcoholic beverages.

## B. LEGAL DISCUSSION

### 1. *The Plaintiff Met His Burden To Prove the Negligence of All Defendants*

Plaintiff-Ferguson was a paid ticket holder and a business invitee to the EFC sponsored concert hosted by the Phillies and secured by NES, whose services were paid by EFC. These three defendants owed common-law and contractual duties to Mr. Ferguson. This post-trial court refers to and accepts the comprehensive overview submitted in plaintiff's brief in opposition to the defendants' motions for post-trial relief, pp. 19-29.

The Phillies, NES and EFC were active participants in the common enterprise for the purpose of hosting the Jimmy Buffett concert for profit and mutual benefit. This was a joint business promotion and a joint venture engaged in by these defendants. In *Gold & Company v. Northeast Theater Corporation,* 281 Pa. Super. 69, 421 A.2d 1151 (1980), the appellate court reviewed well-established Pennsylvania tenets of joint ventures noting that each joint venturer is both an agent and a principal of the joint venture. 281 Pa. Super. at 73 n.1, 421 A.2d at 1153 n.1:

"A joint venture is an association of persons or corporations, who by contract, express or implied, agreed to engage in a common enterprise for their mutual profit. *Richardson v. Walsh Construction Co.,* 334 F.2d 334, 336 (3d Cir. 1964)."

See also, *McRoberts v. Phelps,* 391 Pa. 591, 138 A.2d 439 (1958), relying on 30 Am.Jur. Joint Adventures, §§1, 3, 10, and numerous cases cited, that a joint venture is a special combination of two or more persons seeking a

profit, without any actual partnership or corporate designation. Compare, September 8, 2008, N.T. 126-127, where counsel for EFC acknowledges that the concert was a joint effort where each defendant had a relationship with each other, with EFC's post-trial brief, pp. 25-44.

Our appellate courts have determined that whether a duty exists under a particular set of facts is a question of law for judicial determination. *Herczeg v. Hampton Township Municipal Authority,* 766 A.2d 866, 871 (Pa. Super. 2001), citing *Huddleston v. Infertility Center of America Inc.,* 700 A.2d 453, 457 (Pa. Super. 1997). Forty years ago, the Pennsylvania Supreme Court commented about the "well established" Rule of Law which states that a possessor of land who holds that land open for business purposes has a duty to the patrons to prevent tortious acts by third parties to his patrons. *Moran v. Valley Forge Drive-In Theatre Inc.,* 431 Pa. 432, 246 A.2d 875 (1968). See also, *Rabutino v. Freedom State Realty Company Inc.,* 809 A.2d 933 (Pa. Super. 2002).

The issues in the negligence analysis are grounded in section 344 of the Restatement (Second) of Torts which capsilizes the particular duty of care which is present here:

"A possessor of land who holds it open to the public for entry for his business purposes is subject to liability to members of the public while they are upon the land for such a purpose, for physical harm caused by the accidental, negligent, or intentionally harmful acts of third persons or animals, and by the failure of the possessor to exercise reasonable care to

"(a) discover that such acts are being done or are likely to be done, or

"(b) give a warning adequate to enable the visitors to avoid the harm, or otherwise to protect them against it."

As joint venturers, the possessors of land, *specifically these three defendants,* have a duty to police the premises as set forth in comment f:

"*f. Duty to police premises.* Since the possessor is not an insurer of the visitor's safety, he is ordinarily under no duty to exercise any care until he knows or has reason to know that the acts of the third person are occurring, or are about to occur. He may, however, know or have reason to know, from past experience, that there is a likelihood of conduct on the part of third persons in general which is likely to endanger the safety of the visitor, even though he has no reasons to expect it on the part of any particular individual. If the place or character of his business, or his past experience, is such that he should reasonably anticipate careless or criminal conduct on the part of third persons, either generally or at some particular time, he may be under a duty to take precautions against it, and to provide a reasonably sufficient number of servants to accord a reasonable protection."

Contrary to the Phillies sur-reply, at page 5, the issue is not whether the Phillies were negligent in hiring NES, rather, "EFC, the Phillies and NES . . . failed to ensure that the security function was properly carried out . . . ." Plaintiff's brief, at page 27.

Carl Monzo (NES), Eric Tobin (Phillies) and John Stevenson (EFC), had reason to know of prior incidents of crowd control problems including rowdy and boisterous behavior and more, which was fueled by consumption of alcohol at the tailgating parties prior to the con-

certs and the sale of alcohol during the events. In Mr. Monzo's opinion all 45,000 concert goers were "rowdy." September 3, 2008, N.T. 158. NES considers issues about people getting punched or in fights "all the time," according to Mr. Lynch. September 8, 2008, N.T. 46. Mr. Monzo explained to the jury that at Jimmy Buffett concerts many men dressed in grass skirts and coconut bras. September 4, 2008, N.T. 48.

The Phillies, EFC and NES should have and did anticipate careless conduct on the part of third persons *and* were under a duty to take precautions against such conduct *and* to provide a reasonable sufficient number of servants to afford reasonable protection to Greg Ferguson. Simply because the Phillies and EFC engaged NES to provide security coordination does not relieve those defendants from their legal duty to exercise care to their customers.

All of the defendants were aware of the security rider contract between Jimmy Buffett and EFC, which required, in part: "Deployment of security personnel . . . to deter and prevent any aggressive actions on the part of the venue patrons." Mr. Stevenson acknowledged EFC's responsibility to provide experienced, first class security. September 5, 2008, N.T. 11-18. The Phillies expected that if a security person had seen someone chest-butt a patron, get aggressive or punch a patron, the proper thing to do would be to intervene and try to protect the patron. September 3, 2008, N.T. 118. All of the defendants participated in pre-concert meetings with Jimmy Buffett representatives. They knew that there would be seats for 10,000 concert goers on the ball field seating area. NES provided 167 security personnel for that area.

The Superior Court in *Rabutino v. Freedom State Realty Co. Inc.,* supra, considered whether the business owner's breach was a legal cause of injury to the plaintiff. The appellate court concluded that so long as there was a foreseeable probability of injury to one within the ambit of danger, summary judgment was denied. In this case, judgment n.o.v. and motions for new trial are denied. Mr. Frank Lynch, the NES Director of Operations explained on September 8, 2008, N.T. 46, that disturbances were foreseeable, "Because anytime you have alcohol involved, obviously there is a potential for anything." Plaintiff Ferguson established the duty of these three joint venturers. The plaintiff established the breach of that duty. Mr. Ferguson also established that the breach was a legal cause of his serious and permanent injuries.

## 2. *The Evidentiary Rulings Were Proper*

### a. Terence Gibbs Was Plaintiff's Expert Witness in Security Practices

After extensive examination relating to his qualifications, which include 30 years as a police officer, Mr. Terence Gibbs was presented without any objection, as Mr. Ferguson's expert witness in security practices. September 5, 2008, N.T. 114-34. At this post-trial juncture the defendants have objected to a hypothetical question posed to the witness at trial. They are also challenging Mr. Gibbs' response to a different question. In both instances, when defense counsel objected, the trial court correctly explained the law to the jury. These post-trial arguments are meritless.

Initially, the record reveals on September 5, 2008, N.T. 149, Mr. Ferguson's attorney presented a lengthy hypothetical question to his expert witness. At N.T. 152, defense counsel objected, stating "It assumes a lot of facts not in evidence." The objection was overruled by the court and the jury was told on N.T. 152-53:

"Ladies and gentlemen, the objection—well, let me start here. Mr. McKissock gave a hypothetical. And then he is asking Mr. Gibbs to give an opinion. The objection is that the hypothetical that was presented has added facts that we haven't heard, facts that are not in evidence. It's up to you as jurors to decide whether or not the expert opinion that we are going to hear is based on actual facts that were in evidence or were they different facts, or maybe just information that we never heard.

"But that's up to you to decide. And you will hear me say that again in my charge to you at the end of the case. So you have heard the hypothetical, you heard the objection. I am going to overrule the objection but I want you to understand, I told you from the beginning, you are the judges of the facts.

"We heard a variety of witnesses yesterday, several witnesses. Each person gave their version of the facts and it's up to you to decide what are the facts and whether or not this hypothetical has all the facts or some of the fact or whatever.

"So, you can answer, Mr. Gibbs."

Pa.R.E. 705 states in part, that, "the expert must testify as to the facts or data on which the opinion or inference is based." See Bernstein, 2008 Pa. Rules of Evidence, comment 6 to Pa.R.E. 705 (Gann), noting a

hypothetical question remains the most effective tool for focusing the jury on the salient facts, and delineates the party's version of the facts.

Our Pennsylvania appellate courts have recognized that the facts presented in a hypothetical question need not be proven to the satisfaction of the opposing parties, *e.g., Battistone v. Benedetti,* 385 Pa. 163, 122 A.2d 536 (1956); *Kremer v. Janet Fleisher Gallery Inc.,* (1982 Pa. Super. Lexis 6072); *Astro Remodeling and Westmoreland Casualty Co. v. W.C.A.B. (Julye),* 80 Pa. Commw. 552, 471 A.2d 1320 (1984). The expert must disclose the facts upon which the expert relied in forming his opinion. If the jury does not accept the facts upon which the expert opinion was based, they are free to reject that opinion. Packel and Poulin, Pennsylvania Evidence, §705-1 (West 2007) and cases cited. Moreover, as the Supreme Court noted more than 50 years ago, the defendants were also permitted to present a hypothetical question based on factors they reasonably believed were established by the evidence. *Battistone v. Benedetti,* supra, 385 Pa. Super. at 170, 112 A.2d at 539, citing *Gillman v. Media,* 224 Pa. 267, 274, 73 A. 342, 344 (1909).

Next, the transcript reveals that as soon as the defense counsel objected to testimony which was beyond the scope of the expert report, the trial court sustained the objection and gave a cautionary instruction to the jury. September 5, 2008, N.T. 161-62. At this post-trial juncture, these defendants have declined to explain why they failed to object to the earlier questions posed at N.T. 160-61. A prompt, specific and timely objection to the *question* and not the *answer* would have prevented the

testimony. *Harman ex rel Harman v. Borah,* 562 Pa. 455, 756 A.2d 1116 (2000).

### b. The Diagnosis and Conclusions of
### Mr. Ferguson's Treating Physician
### Were Properly Admitted into Evidence

During the Jimmy Buffett concert, Mr. Ferguson was punched in the left side of his face by the aggressor known at trial as "the coconut bra man." The jury heard Edmund Pribitkin M.D., a surgeon who specializes in head and neck surgery, and facial, plastic and reconstructive surgery. Video, N.T. 12. Dr. Pribitkin performs most of the facial trauma surgery at Thomas Jefferson University Hospital, N.T. 13, and was plaintiff Ferguson's treating physician.

Dr. Pribitkin explained that the plaintiff suffered a fracture across the bridge of his nose, and the left eye socket was pushed in. Video, N.T. 27. The orbit was crushed and forced into the nose area causing injury to Mr. Ferguson's sinus and restriction to his gaze. Video, N.T. 27-29.

During surgery on September 2, 2005, the fracture was exposed, the bones manipulated back into place and then secured with titanium plates. Video, N.T. 29-34. Dr. Pribitkin testified that the injury was caused by the assault at the Jimmy Buffett concert.

On February 23, 2006, the doctor prepared a report indicating good progress following the surgery. Dr. Pribitkin noted that the plaintiff, "may have infraorbital nerve injury . . . and may be permanent . . . ." On the date his trial testimony was filmed, August 27, 2008, Dr.

Pribitkin submitted a supplemental report, dated August 15, 2008. In this report the surgeon comments as his impression:

"Left infraorbital neuralgia following trauma. This has persisted for two years and has not improved and has not worsened, but is stable. I do not feel that it will be improved over time and feel this is a permanent nerve injury with the sequela as described above."

It is this 2008 report to which these defendants object. Their arguments are without merit.

The 2008 medical report does not raise any new theories of injury nor does it create a "surprise" in its conclusion of permanency. The second report was relevant and admissible evidence. See Pa.R.E. 402. The 2006 report sufficiently apprised these defendants of the surgeon's conclusions such that the defendants could have and did prepare a meaningful response. Their cross-examination of Dr. Pribitkin was vigorous, thoughtful and thorough. Video, N.T. 66-113.

### 3. The Jury Instructions Were Clear and Accurate and Did Not Mislead the Jury

The defendants have challenged the trial court's charge to the jury. It is well settled that when reviewing a trial court's instructions it must be viewed as a whole. Jury instructions must be upheld if they adequately and accurately reflect the law and are sufficient to guide the jury in its deliberations.

The Supreme Court has reiterated the guidelines in *Stewart v. Motts,* 539 Pa. 596, 606, 654 A.2d 535, 540 (1995):

"In examining these instructions, our scope of review is to determine whether the trial court committed clear abuse of discretion or error of law controlling the outcome of the case. *Williams v. Philadelphia Transportation Company,* 415 Pa. 370, 374, 203 A.2d 665, 668 (1964). Error in a charge is sufficient ground for a new trial, if the charge as a whole is inadequate or not clear or has a tendency to mislead or confuse rather than clarify a material issue. *Glider v. Com. Dept. of Hwys.,* 435 Pa. 140, 151-52, 255 A.2d 542, 547 (1969). A charge will be found adequate unless 'the issues are not made clear to the jury or the jury was palpably misled by what the trial judge said or unless there is an omission in the charge which amounts to fundamental error.' *Voitasefski v. Pittsburgh Rys. Co.,* 363 Pa. 220, 226, 69 A.2d 370, 373 (1949). A reviewing court will not grant a new trial on the ground of inadequacy of the charge unless there is a prejudicial omission of something basic or fundamental. *Sweeny v. Bonafiglia,* 403 Pa. 217, 221, 169 A.2d 292, 293 (1961); *Giorgianni v. DiSanzo,* 392 Pa. 350, 356, 140 A.2d 802, 805 (1958). In reviewing a trial court's charge to the jury, we must not take the challenged words or passage out of context of the whole of the charge, but must look to the charge in its entirety. *McCay v. Philadelphia Electric Company,* 447 Pa. 490, 499, 291 A.2d 759, 763 (1972)."

The contention of each defendant is that it was legal error for the trial court to read a criminal statute in a civil case. Here, the court read the charge defining use of force for protection of others. 18 Pa.C.S. §506. The defendants do acknowledge that the Superior Court has recognized that the law governing the right of self-de-

fense in civil cases is the same as in criminal context. 18 Pa.C.S. §505. *Kitay v. Halpern,* 104 Pa. Super. 167, 158 A. 309 (1932), quoted with favor in *Simmons v. Galin,* 2002 U.S. Dist. Lexis 1259 (E.D. Pa. 2002).

Self-defense and defense of others are established when the individual reasonably believes that he or another is in imminent danger of bodily harm. The United States District Court for the District of Columbia recently articulated "defense of another," in a civil case which provides guidance here. *Rude v. Adeboyeku,* 552 F. Supp.2d 32, 35 (D.C. Cir. 2008):

" 'When it comes to determining whether force is reasonably necessary to defend a third person under attack, the focus ultimately must be on the intervenor's [Ferguson's], not the victim's [Dr. Steven Cunning], reasonable perceptions of the situation.' *Frost v. United States,* 618 A.2d 653, 661 (D.C. 1992). (citations omitted) In order to prove that an intervenor has the right to use force in the defense of another person, the intervenor must show that he reasonably and actually believed that the other person had a right of self-defense. *Id.* (citing *Fersner v. United States,* 482 A.2d 387, 390 (D. C. 1984)); Standardized Civil Jury Instructions for the District of Columbia §19.06 (2007). Although a jury's focus is on the intervenor's 'reasonable perceptions of the situation, . . . [t]he victim's perception of the situation, however, is still relevant "to determine what the intervenor's perceptions actually and reasonably were." ' *Muschette v. United States,* 936 A.2d 791, 799 (D. C. 2007) (citing *Fersner,* 482 A.2d at 392)."

Looking at the evidence in a light most favorable to the verdict winner, the plaintiff established that the co-

conut bra man was using foul and abusive language and was yelling at Loren Cunning. She started crying. September 5, 2008, a.m., N.T. 53-54. When Steven Cunning Jr. (her fiance) came over, the coconut bra man started "chest-bumping" Steven and getting "in his face." Then, when Steven's mother said "Get away from my son," September 5, 2008, N.T. 55, Steven's father, Dr. Cunning came forward toward Loren Cunning. This entire series of events occurred within 30-40 seconds. September 5, 2008, N.T. 56.

As soon as Dr. Cunning said, "Step away," the coconut bra man threw a right hook and punched Dr. Cunning. Dr. Cunning was violently thrown two rows back, and the coconut bra man followed him. September 5, 2008, N.T. 56-57. Dr. Cunning was bleeding. As Dr. Cunning was being assisted by his son, Steven Jr., the coconut bra man walked over, making gestures with his fist, raising and clinching his fist, and took a fight stance. September 5, 2008, N.T. 58-59. At that point, plaintiff Ferguson related to the jury at September 5, 2008, N.T. 59-60:

"As soon as I saw him going back after Steve or his father, I jumped over seats that had been knocked down .... and pushed him, pushed the guy away from him .... I pushed him in his shoulder and his chest area, pushed him away from Dr. Cunning and Steve."

Greg Ferguson stated that when the coconut bra man turned away from the other men and toward him, he never saw the punch coming. September 5, 2008, a.m., N.T. 60. His blood was everywhere.

Dr. Cunning did have a right to defend himself after he was attacked by the coconut bra man. See also, *Hughes v. Babcock,* 349 Pa. 475, 37 A.2d 551 (1944), defense of

property; *Kitay v. Halpern,* 104 Pa. Super. 167, 158 A. 309 (1932), self-defense. The charge to the jury was an accurate statement of the law and was supported by the evidence and inferences in the trial. The defendants were not prejudiced by the instructions. Whether or not the jury accepted the plaintiff's rationale for intervening in the incident, the jury verdict sheet provided them an opportunity to decide if Mr. Ferguson's actions caused or contributed to his own injuries.

Finally, although EFC suggests that the plaintiff should have called for help prior to his interaction with the coconut bra man, the record reveals that Mrs. Cunning testified that she repeatedly shouted for help. She also looked around for the security staff in their yellow shirts. No one from NES or EFC or the Phillies assisted the plaintiff or Dr. Cunning or Loren Cunning until after Mrs. Cunning ran across the aisle and located NES personnel. September 4, 2008, N.T. 13. Mr. Monzo confirmed that Mrs. Cunning gave a prior consistent statement on the night of the incident. With this in mind, the exceptions to 18 Pa.C.S. §506 are not applicable and were not read to the jury.

## C. CONCLUSION

For all of the reasons set forth above, all of the defendants' motions for post-trial relief are denied and judgment will be entered in favor of Greg Ferguson in the amount of $150,000.

## JUDGMENT ORDER

And now, March 19, 2009, after considering all of the motions for post-trial relief filed by all of the defendants,

and the plaintiff's response thereto, and for the reasons set forth in the memorandum filed this date, it is hereby ordered that all of the defendants' motions are denied, and judgment is entered in favor of Greg Ferguson in the amount of $150,000 and against Electric Factory Concerts Inc., National Events Services Inc. and the Phillies.