Israel H. **FERSNER**, Appellant,

v.

**UNITED STATES**, Appellee.

No. 83–481.

District of Columbia Court of Appeals.

Argued June 7, 1984.

Decided Sept. 26, 1984.

Bruce B. McHale, Washington, D.C., for appellant.

John M. Facciola, Asst. U.S. Atty., Washington, D.C., with whom Joseph E. diGenova, U.S. Atty., and Michael W. Farrell, Asst. U.S. Atty., Washington, D.C., were on the brief, for appellee.

Before FERREN and ROGERS, Associate Judges, and REILLY, Chief Judge, Retired.

FERREN, Associate Judge:

A jury, rejecting appellant's claim of self-defense, convicted him of second-degree murder while armed, D.C.Code §§ 22–2403, –3202, and carrying a dangerous weapon. D.C.Code § 22–3204 (1981). The trial court sentenced him to consecutive prison terms of fifteen years to life on the murder

charge and of three to nine years on the weapon charge. On appeal, he argues that the trial court erred in refusing to give an instruction on the use of deadly force in defense of a third person. We affirm.

## I.

On the evening of July 31, 1980, appellant and several of his acquaintances gathered in a parking lot behind the Brentwood Village apartments. The decedent, Maurice Winslow, approached them. Earlier, several of the women in the group, including Winslow's girlfriend, had been together at various bars. Winslow had learned that the women were going to one particular bar, but as it turned out they had stayed only a few minutes and thus apparently were not at the bar where Winslow believed he would find them. Winslow asked one of the women, Diane Aull, why she had lied to him (presumably about where the women were planning to go). One witness testified that appellant's girlfriend, Geraldine Barnes, told Aull she did not have to answer Winslow. Barnes testified that she had said nothing to Aull. In any event, Winslow struck Barnes with his hand or fist.

Barnes then went over to appellant, who was seated in a van a short distance away, and told him that Winslow had hit her for no reason. Appellant then walked toward Winslow, who by this time was engaged in an altercation with another woman in the group, Laverne Reed. Accounts of the altercation varied greatly as to whether Winslow or Reed had instigated the fight, whether Reed struck Winslow, and whether Winslow was slapping, punching, kicking, or stomping Reed. The witnesses agreed, however, that Winslow hit Reed at least once before appellant approached him. Reed suffered facial lacerations as a result of the incident.

After appellant and Winslow had exchanged a few words, Winslow turned around and went to his car to get something, which he then put into his pocket. Appellant returned to his own car and put on his tool belt which contained several tools, including a hatchet. Winslow went back toward Reed and Aull. Appellant then approached Winslow and, soon thereafter, struck him either once or twice on the head with the hatchet. Winslow fell to the ground.

The witnesses disagreed about what Winslow was doing immediately before appellant struck the initial blow. Rosie Johnson testified that Winslow was standing in a threatening posture in front of Diane Aull and having a heated discussion with her. Aull corroborated this account, saying that Winslow had just knocked Reed down but had turned back to Aull before appellant hit him. In contrast, Reed herself testified that Winslow, at the time he was struck, had already knocked her to the ground and was beating her. Similarly, Harry Jenkins testified that Winslow, at the moment of the first blow from appellant's hatchet, was kicking and stomping on Reed, saying he would break her neck. Appellant and William Kenney presented still another story. They testified that Winslow, with knife in hand, was facing appellant at the time Winslow received the first blow. Isaac Batts similarly testified that Winslow, while facing appellant, was beginning to remove an object from his own pocket. Finally, Barnes testified that Winslow had turned away from beating Reed to face appellant, in response to a remark by appellant.

The witnesses agreed that after Winslow fell to the ground, appellant struck him again three to eight times as he lay there. According to the testimony of Johnson, Aull, and appellant, Miles Jenkins told appellant to stop, and he did. Winslow then attempted to get up from the ground. At this point, according to government witnesses, Reed began to hit Winslow with the bicycle frame, then appellant pushed her aside and attacked Winslow again with the hatchet. Appellant also testified that after Winslow attempted to get up, appellant hit him again with the hatchet.

Medical testimony indicated that Winslow had suffered at least 13 hatchet blows to the back of his head. Winslow died of his injuries the next day.

## II.

In addition to asking for a jury instruction on self-defense, which the trial court granted (based on Kenney's, Batts', Barnes' and appellant's testimony), appellant requested an instruction on the use of force in defense of a third person, Laverne Reed (based on Reed's and Jenkins' testimony).[1] The court denied this request.[2]

■ The trial court correctly observed that the right to use force in defense of a third person is predicated upon that other person's right of self-defense. *Taylor v. United States*, 380 A.2d 989, 994–95 (D.C. 1977).[3] The court went on to say, however, that appellant's right to use force in the

defense of Ms. Reed, as well as his right to determine the amount of force necessary, turned exclusively on Reed's own perception—not on appellant's perception—of the situation:

> It seems to me the key to the situation with Ms. Reed is her own testimony because it is quite clear that, under the law, that any interven[or] on her behalf only has the same right of self-defense that she does. I cannot find that as a matter of law from Ms. Reed's testimony that she had the right to use deadly or dangerous weapon force. I do not find anything from which anyone could conclude that she was, from her own testimony, in imminent danger of serious bodily harm or death of the type that is needed to justify that defense. I will not give that instruction.

In other words, the court concluded first that Reed—based on her own testimony

---

1. Criminal Jury Instructions for the District of Columbia, No. 5.20 (3d ed. 1978), provides:

 DEFENSE OF A THIRD PERSON

 A person has the right to use a reasonable amount of force in defense of another person under certain circumstances. First, the defendant must actually believe that the other person is in imminent danger of bodily harm. Second, under the circumstances as the defendant believes them to be, the person who[m] he seeks to protect would have to be justified in using a reasonable amount of force in his own self-defense. Third, the defendant must have reasonable grounds for his belief that the other person is in imminent danger of bodily harm. Finally, the defendant must believe that his intervention is necessary for the protection of the other person.

 The question is not whether you believe, in retrospect, that the use of force by the defendant was necessary. The question is whether the defendant, under the circumstances as they appeared to him at the time of the incident, actually and reasonably believed that the person he was seeking to defend was in imminent danger of bodily harm and was in need of his protection, and whether the person the defendant sought to protect would himself have been justified in resorting to self-defense under the circumstances as perceived by the defendant.

 The defendant is not required to prove that he acted in the defense of another person. If *evidence of defense of another person* is present, the government must prove beyond a reasonable doubt that the defendant did not

act in the defense of another person. If you find that the government has failed to prove beyond a reasonable doubt that the defendant did not act in defense of another person, then you must find him not guilty.

2. Appellant's own testimony supported only a self-defense instruction, since he said he responded with his hatchet when Winslow confronted him with a knife. That testimony does not preclude appellant's request for an instruction on defense of a third person; "a defendant is entitled to an instruction on any issue fairly raised by the evidence, whether or not consistent with the defendant's testimony or the defense trial theory." *Womack v. United States*, 119 U.S.App.D.C. 40, 40, 336 F.2d 959, 959 (1964). *But see United States v. Crowder*, 177 U.S.App.D.C. 165, 543 F.2d 312 (1976) (en banc), *cert. denied*, 429 U.S. 1062, 97 S.Ct. 788, 50 L.Ed.2d 779 (1977) (self-defense instruction properly refused when defendant testified he did not shoot at all and self-defense theory could be derived only by speculation based on fragments of testimony).

3. In *Taylor*, 380 A.2d at 994, we said:

 In order to offer a viable defense based on defense of another, the intervenor must demonstrate that the third party was the innocent victim of an unlawful attack, *i.e.*, the intervenor must prove that the victim of the attack was himself entitled to the defense of self-defense. *Purdy v. United States*, D.C.App., 210 A.2d 1, 2 (1965); R. Perkins, Criminal Law 1019–21 (2d ed. 1969).

that Winslow struck her approximately nine times causing facial bleeding—would not have been entitled to use deadly force in self-defense. For that reason, the court next concluded, as a matter of law, that appellant was not entitled to use deadly force in defense of Reed, irrespective of his own reasonable perceptions of what was happening to her.[4]

■ The defense of a third person instruction 5.20 (*supra* note 1) does not make clear,[5] and this court has not resolved, whether one who properly comes to the defense of another can be protected by his or her own perceptions, including a reasonable mistake of fact, about the degree of force necessary. Disagreeing with the trial court, we conclude that when the use of force in defense of a third person is justified, the intervenor is entitled to use the degree of force reasonably necessary to protect the other person on the basis of the facts as the intervenor, not the victim, reasonably perceives them. *State v. Chiarello*, 69 N.J.Super. 479, 487–88, 174 A.2d 506, 514–15 (1961); R. PERKINS & R. BOYCE, CRIMINAL LAW 1146–47 (3d ed. 1982).[6]

■ We arrive at this conclusion by first examining the factors to be considered in determining whether an act of self-defense is legally permissible and then by applying this analysis to defense of a third person. The right of self-defense, and especially the degree of force the victim is permitted to use to prevent bodily harm, is premised substantially on the victim's own reasonable perceptions of what is happening. Criminal Jury Instructions for the District of Columbia, No. 5.14 (3d ed. 1978) (self-defense—amount of force permissible). The victim's perceptions may include, for example, an enhanced sense of peril based on personal knowledge that the attacker has committed prior acts of violence. *See generally Johns v. United States*, 434 A.2d 463 (D.C.1981), *reh'g en banc denied*, 449 A.2d 1074 (1982); Criminal Jury Instructions, *supra*, No. 5.18 (self-defense—past violence by complainant or decedent). Indeed, the victim's personal perceptions are so significant that they may justify the use of reasonable, including deadly, force in self-defense "even though it may afterwards have turned out that the appearances were false." Criminal Jury Instructions, *supra*, No. 5.15; *accord Williams v. United States*, 131 U.S.App.D.C. 153, 156–57, 403 F.2d 176, 179–80 (1968). In sum, the victim's subjective perceptions are the prime determinant of the right to use force—and the degree of force required—in self-defense, subject only to the con-

---

4. Apparently because deadly force was used against Winslow, the trial court did not address the question whether Reed—or appellant on Reed's behalf—could have used nondeadly force against Winslow.

5. Instruction 5.20 requires, in the first paragraph, that for an intervenor "to use a reasonable amount of force in defense of another person," that other person must "be justified in using a reasonable amount of force in his own self-defense," given "the circumstances as the [intervenor] believes them to be." This does not make clear whether an intervenor is entitled to use greater force, based on his or her own perceptions, than the victim reasonably could use.

 Similarly, paragraph two of instruction 5.20 states that the question is not whether an intervenor's "use of force," in retrospect, was "necessary" but "whether the [intervenor], under the circumstances as they appeared to him at the time of the incident, actually and reasonably believed" that the victim was "in imminent dan-

ger of bodily harm," was "in need of [the intervenor's] protection," and "would himself have been justified in resorting to self-defense under the circumstances as perceived by the defendant." Again, this paragraph permitting an intervenor's "use of force" if the victim is justified in "resorting to self-defense" does not address the question at issue here: whether an intervenor justifiably could use deadly force, based on his own perceptions, when the victim justifiably could use only non-deadly force, or even no force at all, given her own understanding of the situation.

6. R. PERKINS & R. BOYCE, *supra*, at 1147 conclude:

 Subject to the familiar limitations as to the degree of force permitted, one who is himself free from fault may intervene and use force to protect an innocent victim of intended crime. And under the sound view he is protected by the usual mistake-of-fact doctrine and may act upon the situation as it reasonably seems to be (citing *Chiarello, supra*).

straint that those perceptions be reasonable under the circumstances.

 Given the subjective aspect of the right of self-defense, we find no rational basis for permitting an intervenor to come to the defense of a third person, with all the attendant risks, but conditioning that right on the victim's rather than the intervenor's reasonable perceptions. Obviously, in attempting to determine what the intervenor's perceptions actually and reasonably were, the trier of fact will find relevant the victim's own perceptions. But when it comes to determining whether—and to what degree—force is reasonably necessary to defend a third person under attack, the focus ultimately must be on the intervenor's, not on the victim's, reasonable perceptions of the situation.

 It follows that an intervenor may be entitled to use more, or less, force than the victim reasonably could use, depending on their respective perceptions and available resources. For example, an intervenor may reasonably be entitled to use greater force than the victim herself would perceive necessary if the intervenor knows, while the victim does not, that the attacker has killed before. On the other hand, when an intervenor on behalf of a victim of an unarmed assault has strength considerably superior to that of the attacker, the intervenor may reasonably be limited to less force than would a slightly-built victim who has access to a knife. In the present case, therefore, even if Reed herself could not reasonably have perceived that deadly force was necessary in her own self-defense, this does not preclude a finding that appellant reasonably perceived that his use of deadly force was necessary to protect her.

### III.

 We turn to the facts. An accused is entitled to a requested instruction on the defense theory of the case "if there is 'any evidence fairly tending to bear upon the issue ...', however weak." *Rhodes v. United States,* 354 A.2d 863, 864 (D.C. 1976) (citations omitted). The question, therefore, is whether there is any evidence of record fairly tending to show that appellant reasonably believed there was a need to use deadly force—specifically, enough force to kill Winslow—to prevent death or serious bodily harm to Laverne Reed.

 As properly adapted from standard jury instruction 5.14 on the amount of force permissible in self-defense,[7] the requested instruction as to defense of a third person (*supra* note 1) would include two additional explanations. First, the court would have to instruct on the use of deadly force:

A person may use a reasonable amount of force in defense of another person, including, in some circumstances, deadly force. "Deadly force" is force which is likely to cause death or serious bodily harm. A person may use deadly force in defense of another person if [he] [she] actually believes at the time of the incident that that person is in imminent danger of death or serious bodily harm from which [he] [she] can save that person only by using deadly force against the assailant, and if [his] [her] belief is reasonable.

Second, the court would have to put the use of deadly force in perspective by also cautioning the jury about the use of excessive force:[8]

Even if the defendant was justified in using force in defense of another person, [he] [she] would not be entitled to use any greater force than [he] [she] had reasonable grounds to believe and actually did believe to be necessary under the circumstances to save the other person's life or avert serious bodily harm.

In determining whether the defendant used excessive force in defending another person, you may consider all the circumstances under which [he] [she] acted.

**7.** Criminal Jury Instructions, *supra,* No. 5.14.

**8.** *Cf.* Criminal Jury Instructions, *supra,* No. 5.14.

The claim of defense of a third person is not necessarily defeated if greater force than would have seemed necessary to a calm mind was used by the defendant in the heat of passion generated by an assault upon the third person. A belief which may be unreasonable to a calm mind may be actually and reasonably entertained in the heat of passion.

■ There was some evidence, particularly Reed's testimony that Winslow was "beating" her and Jenkins' testimony that Winslow was "kicking" and "stomping" on Reed and threatening to break her neck, fairly tending to show that Reed in fact was threatened with serious bodily harm at the time appellant intervened. Appellant and other witnesses testified, moreover, that on previous occasions Winslow had threatened others with injury and death and that he had beaten up several persons, including his girlfriend. Finally, there was testimony indicating that Reed, who was intoxicated and lying on the ground, was unable to defend herself effectively. This evidence would be sufficient to support a jury finding that appellant reasonably believed Reed was in imminent danger of serious bodily harm, and thus that appellant was entitled to use deadly force.

■ The inquiry does not end here, however. In order to provide a basis for the instruction on defense of a third person, appellant also had to point to evidence fairly tending to show that he reasonably believed the particular deadly force he used to avert serious bodily harm to Reed—a hatchet blow to Winslow's head—was necessary, not excessive, under the circumstances.

■ While we must accept as true, for purposes of evaluating appellant's right to the requested instruction, that Winslow was "kicking," "stomping," or "beating" on Reed [9]—and threatening to break her neck—at the time appellant felled Winslow with one or two hatchet blows,[10] we can easily say on this record, as a matter of law, that appellant did not have "reasonable grounds to believe"—even if acting "in the heat of passion"—that hatchet blows to Winslow's head were necessary to defend Reed. Even if appellant was entitled to use deadly force—*i.e.*, force "likely to cause death or serious bodily harm"—there are, as this definition implies, degrees of deadly force. On some occasions, it may be reasonable only to cause serious bodily harm not threatening life itself. This is such a case. Under the circumstances here, appellant obviously could have saved Reed by striking Winslow with the blunt side of the hatchet elsewhere on the body, with less damaging (here fatal) results. As a matter of law, therefore, appellant used excessive force; it was not necessary for appellant to use an amount of deadly force that was likely to kill Winslow.

*Affirmed.*

9. Although there was testimony that Winslow earlier had struck Reed with a bicycle frame, no witness testified that he was using any weapon at the time of appellant's intervention. The witnesses who testified that Winslow pulled a knife on appellant did not claim to have seen this knife before or during the altercation with Reed. At most, the evidence could be taken to show that at the time he first struck Winslow with the hatchet, appellant reasonably believed Winslow had concealed some sort of weapon about his person after going to his car.

10. Clearly, after the first two hatchet blows, all other blows occurred after Reed had been rescued. Any justification of those later blows would have to be a matter of appellant's own self-defense, for which he received an instruction that did not spare him from conviction.