**Adrian T. LEE, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 11–CF–109.**

District of Columbia Court of Appeals.

Argued Jan. 30, 2013.
Decided Feb. 28, 2013.

Mikel–Meredith Weidman, Public Defender Service, with whom James Klein and Jaclyn Frankfurt, Public Defender Service, were on the brief, for appellant.

Amanda Winchester, Assistant United States Attorney, with whom Ronald C. Machen Jr., United States Attorney, and Elizabeth Trosman, John P. Mannarino, and Jocelyn Ballantine, Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN and OBERLY, Associate Judges, and FARRELL, Senior Judge.

FARRELL, Senior Judge:

A jury found appellant guilty of voluntary manslaughter as a lesser included offense of the charged crime of second-degree murder, and of carrying a dangerous weapon. The charges arose from the stabbing death of Chiagbanwe Ukaoma (Chi). Appellant's defenses at trial, both submitted to the jury on instructions, were self-defense and defense of a third person, Donald Branch. On appeal, appellant argues that the trial judge erroneously, and prejudicially, instructed the jury that Branch must have had the right to defend himself in the circumstances—regardless of "the circumstances as they appeared to [appellant]"—for the defense of another person to be available to him. Although some ambiguity in our leading decision on this point may have influenced the trial judge, we hold that the challenged instruction was erroneous and that, because the error was prejudicial as we explain in part III, *infra,* appellant is entitled to a new trial at which the important perspectival aspect of the right to defense of a third person is correctly explained to the jury.

## I.

The stabbing in question took place outside a carryout restaurant in Northwest

Washington, D.C. On the heels of a verbal confrontation outside the carryout, appellant's friend Donald Branch began a fistfight by "sucker-punch[ing]" Jachinma Ukaoma in the face. Other Ukaoma family members, including Obinna and Chi, ran to Jachinma's aid, and "[e]verybody started fighting" as two other men—including appellant—joined Branch's side of the fray. It was undisputed that at some point during the fight, appellant stabbed Chi Ukaoma fatally through the heart with a pocketknife. Beyond that, the parties offered sharply different versions of the events.

According to government witnesses, appellant had barely joined the fray when he pulled a pocketknife and tried to stab Jachinma in the stomach. Jachinma escaped to a nearby truck to retrieve a weapon, but when he returned Chi lay on the ground wounded, and the brief fight was over. Branch, testifying for the government, admitted that he had started the fight and exchanged repeated punches with Chi and Obinna. Although hit twice by fists from behind and knocked down at one point, he got up and held his own in the further exchange (he "kn[e]w how to fight real good"), sustaining only facial wounds that required no medical treatment. A passerby, Kirk Williams (a civilian police department employee), witnessed the fight in which the combatants all used fists and were "just swinging," until a tall guy wielding a sharp silver object—inferentially appellant—"came straight downward with it toward a man being pummeled." None of the Ukaomas saw Chi being stabbed, but Obinna heard Chi call his name as if needing help as Chi fought with appellant. When Obinna pulled appellant off of Chi, appellant stood up and yelled, "Yeah, yeah, yeah." Chi ran a short distance and fell, fatally wounded by a single, three-and-a-half to four-inch knife stab through the heart.

According to appellant's very different testimony, Branch had been arguing verbally with Jachinma when appellant saw two men emerge from a parked truck and rush toward Branch. Appellant stepped in front of them to protect Branch, declaring "[t]his is going to be a one-on-one fight." With his back turned to Branch and Jachinma, appellant did not see which of them threw the first punch, but as the two fought their way around the front of the parked truck, he followed them, his view obstructed momentarily. When he reached them, Branch was on the ground with four men hitting him and "crushing" him, and was bleeding from the mouth and nose. Appellant pulled out a pocketknife to scare the men off of Branch, afraid they would kill his friend. As he warned the assailants to get off, he himself was struck on the back of the head by a fist, then by a blow from a second man. Defending both himself and Branch ("they [were] beating [Branch] bad"), he swung his right hand around and stabbed someone, then fled the scene and dropped the knife into a trash can, panicking because he had never stabbed anyone before.

At trial, appellant asserted both self-defense and defense of a third person. The jury rejected both defenses, and on appeal he assigns no error concerning self-defense. He challenges as erroneous and prejudicial the judge's instructional limitation—making Branch's own right to self-defense pivotal—on appellant's right to assert the defense of another.

## II.

The right to defend a third person is analogous to the right of self-defense, and like self-defense, can provide a complete defense to criminal charges. "Every person has the right to use a reasonable amount of force in defense of an-

other person if (1) s/he actually believes that the other person is in imminent danger of bodily harm and if (2) s/he has reasonable grounds for that belief." CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA ("Redbook"), No. 9.510, Defense of a Third Person (5th ed. rev.2010). As with self-defense, a person may use deadly force in defense of another person if he actually and reasonably "believes at the time of the incident that that person is in imminent danger of death or serious bodily harm from which s/he can save that person only by using deadly force against the assailant...." *Id.* The Redbook instruction goes on to explain that the reasonableness of the defendant's belief in the need to use force in defense of another must be assessed "under the circumstances as they appeared to him/her at the time of the incident." *Id.*[1]

Over objection in this case, however, the trial judge instructed the jury that the reasonableness of appellant's belief that force was necessary to defend Branch depended finally, not on "the circumstances as they appeared to" appellant, but on whether Branch himself had the right of self-defense. The judge explained to the jury:

Now, as to defense of a third person, every person has the right to use a reasonable amount of force in defense of another person if he, one, actually believes that the other person is in imminent danger of bodily harm; two, he has

reasonable grounds for that belief; and three, *the other person has a right to self-defense.* The question is not whether looking back on the incident, you believe that the use of force was necessary. The question is whether Adrian Lee, under the circumstances as they appeared to him at the time of the incident, actually believed that the person he was seeking to defend was in imminent danger of bodily harm and could reasonably hold that belief *and that other person had a right to self-defense.* (Emphases added.)

In other words, although appellant's reasonable perceptions—"the circumstances as they appeared to him"—counted for something in evaluating the defense, they alone would not allow him to come to Branch's defense. Some evidence had to show that Branch himself had the right of self-defense viewing the circumstances from *his* reasonable perspective.[2]

The trial judge drew this understanding of the law primarily from *Fersner v. United States,* 482 A.2d 387 (D.C.1984). He correctly saw that the focus of that decision had been on whether a defendant invoking defense of another "can be protected by his or her own perceptions, including a reasonable mistake of fact." *Id.* at 391. But the judge read our affirmative answer as limited to perceptions of the *degree* of force necessary by a defendant otherwise entitled to come to a third per-

---

1. Once there is evidence of defense of a third person, the government must prove beyond a reasonable *doubt* that the defendant "did not act in defense of another person." Redbook No. 9.510; *cf. Comber v. United States,* 584 A.2d 26, 41 n. 17, 43 n. 19 (D.C.1990) (en banc).

2. This same condition—Branch's objective right to defend himself—was carried forward to the "escalation" instruction the judge gave in light of the undisputed evidence that

Branch had thrown the first punch. Although, as the judge explained, an "aggressor" ordinarily may not rely on self-defense, if evidence showed that Branch himself had become "the subject of an unreasonable amount of force in repelling his [own] aggression," he could use reasonable force in self-defense "*and* someone coming to his aid [could] use reasonable force in doing so." (Emphasis added.)

son's defense. Some language in *Fersner* appears to support that reading.[3] Nevertheless, it is a reading that we conclude is mistaken.

■ We began our analysis in *Fersner* by recognizing that "the victim's perceptions are the prime determinant of the right to use force—and the degree of force required—in *self-defense*, subject only to the constraint that those perceptions be reasonable under the circumstances." *Id.* at 391–92 (emphasis added). And, "[g]iven the subjective aspect of the right of self-defense," we could "find no rational basis" for conditioning the similar right to defend a third person "on the victim's rather than the intervenor's reasonable perceptions." *Id.* at 392. Thus, although the victim's own perceptions are "relevant" to determining "what the intervenor's perceptions actually and reasonably were," we concluded that,

when it comes to determining whether—and to what degree—force is reasonably necessary to defend a third person under attack, the focus ultimately must be on the intervenor's, not on the victim's, reasonable perceptions of the situation. *Id.*

To be sure, the factual issues in *Fersner* centered around whether the defendant had used *excessive* force in delivering multiple hatchet blows to the victim's head in defending a third person.[4] *See id.* at 392–93. For that reason, the narrower legal principle we announced, and which the trial judge here saw as the limit of our holding, was that "an intervenor may be entitled to use more, or less, force than the victim reasonably could use, depending on their respective perceptions and available resources." *Id.* at 392. But this holding as to the permissible degree of force "follow[ed]," we said, from the broader conclusion quoted above governing both "whether—*and* to what degree—force is reasonably necessary." *Id.* (emphasis added). That broader conclusion cannot reasonably be regarded as dictum,[5] for in the years after *Fersner* the court has consistently read the holding of the case to be, as we said in *Muschette v. United States*, 936 A.2d 791 (D.C.2007), that

justified was defensive action "caus[ing] serious bodily harm not threatening life itself." 482 A.2d at 393. See discussion, *infra*, part III.

---

3. Thus, we said at one point:

Disagreeing with the trial court, we conclude that when the use of force in defense of a third person is justified, the intervenor is entitled to use the degree of force reasonably necessary to protect the other person on the basis of the facts as the intervenor, not the victim, reasonably perceives them. 482 A.2d at 391. Similarly, we later posed "the question at issue here" as

whether an intervenor justifiably could use deadly force, based on his own perceptions, when the victim justifiably could use only non-deadly force, or even no force at all, given her own understanding of the situation.

*Id.* at 391 n. 5.

4. We held that the defendant was not even entitled to an instruction on defense of a third person, because the most the facts would have

5. The government does not contend that it was. It argues, rather, though without fervor, that if *Fersner* makes the defendant's perceptions the "prime determinant" of the right to intervene at all on another's behalf, *Fersner* conflicts with the earlier decision of *Taylor v. United States*, 380 A.2d 989 (D.C.1977), thus requiring en banc resolution of the issue. But the two decisions are not in conflict because *Fersner*, while citing *Taylor*, implicitly distinguished it by concluding that "this court has not [heretofore] resolved" how the defendant's "own perceptions" figure in his entitlement to come to a third person's defense. 482 A.2d at 391. The full court in *Fersner* evidently found no reason to disturb that conclusion.

[t]he defendant must have reasonably believed and actually believed that [the victim] himself had a right of self-defense, and the focus of the inquiry is on the defendant's reasonable perceptions of the situation, not [those] of the third party.

*Id.* at 799 (internal quotation marks omitted) (citing and quoting *Frost v. United States,* 618 A.2d 653, 661 (D.C.1992), in turn quoting *Fersner* ); *see also Jones v. United States,* 555 A.2d 1024, 1027 (D.C. 1989); *Graves v. United States,* 554 A.2d 1145, 1147–48 (D.C.1989).

### III.

■ Given the controlling effect of *Fersner* and succeeding decisions, the government argues almost exclusively on appeal that the judge's instructional error in conditioning appellant's right to intervene for Branch on whether Branch could invoke self-defense was harmless error. The parties dispute, as often in such cases, whether our standard of review is for constitutional error, *see Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), or error of a lesser magnitude. *See Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). We find it unnecessary to decide which test governs here, however, because the government must convince us, at least, that it is " 'highly probable' on this record that the error did not affect the verdict." *Robles v. United States,* 50 A.3d 490, 496 (D.C.2012) (citation omitted); *see Ellis v. United States,* 941 A.2d 1042, 1048 (D.C. 2008). It has not done so.

The government first suggests that appellant's own testimony, read closely, reveals that when he finally swung the lethal blow with the penknife he was doing so strictly to ward off blows to himself—*i.e.,* that defense of Branch was effectively no longer in his mind. But this parses appellant's testimony too finely. Recalling the frenzy of a fight "about survival," he did testify that as he himself got "hit from both sides," he "had to react because it was hurting" and reacted partly by swinging the knife; and that he "couldn't see [Branch] at all after" he himself was hit. But his blind fear, he added ("I didn't know what was going on"), stemmed from "watch[ing] them beat [Branch], and now . . . starting to beat me"; thus he feared that both of them were in deadly peril (he was "scared [he himself] was going with [Branch]") and swung wildly to defend both. Hearing appellant's account, the jury could fairly have taken it as meaning that in his mind Branch's danger and his own were inseparable, demanding his instinctive reaction to protect both of them.

The government further argues that, if the jury believed appellant's account of seeing four men "crush" a bleeding Branch into the ground, it inevitably found—through the judge's escalation instruction—that Branch regained the right to self-defense (though he had been the first aggressor) and so appellant had the right to defend him with reasonable force. But this ignores the real possibility that the jury believed that the truth lay somewhere between appellant's account and Branch's testimony that he was not seriously in danger—that he had begun the fight, continued punching, and knew "how to fight real good"—in which case the jury could have found (in the instruction's words) that Branch had not become "the subject of an unreasonable amount of force [by the Ukaomas] in repelling his aggression."

At bottom the government's argument appears to be that appellant's lethal use of a *deadly* weapon in aiding Branch was so unreasonable in the circumstances of a fistfight that the jury would not have lingered over Branch's entitlement or not to

use self-defense.[6]  In effect, the government likens this case to the situation and actual holding in *Fersner,* where on facts showing that the ultimate victim (Winslow) was " 'kicking,' 'stomping,' or 'beating' on [the third person, Reed] ... and threatening to break her neck," we held that *no* defense-of-another instruction was justified, because "as a matter of law ... appellant did not have 'reasonable grounds to believe' ... that [repeated] hatchet blows to Winslow's head were necessary to defend Reed." *Fersner,* 482 A.2d at 393.  In language the government believes likely mirrored the jury's thinking in this case, we explained:

> Even if appellant was entitled to use deadly force—*i.e.,* force "likely to cause death or serious bodily harm"—there are, as this definition implies, degrees of deadly force.  On some occasions, it may be reasonable only to cause serious bodily harm not threatening life itself.  This is such a case.  Under the circumstances here, appellant obviously could have saved Reed by striking Winslow with the blunt side of the hatchet elsewhere on the body, with less damaging (here fatal) results. . . .  [I]t was not necessary for appellant to use an amount of deadly force that was likely to kill Winslow.

*Id.* So too, a rational jury here, the government implies, must have found appellant's resort to a downward or sideward thrust of the knife straight through Chi Ukao-ma's heart to be excessive force when, even in the heat of passion, something else such as a slash or slashes "elsewhere on the body" could have reinforced appellant's demand—backed up by the presence of Branch's other defenders—for the assailants to stop pummeling Branch.

We do not slight this argument.  A knife-stab through the heart, delivered by what appeared to a disinterested witness (Williams) a downward motion, could well have made the jury skeptical of appellant's insistence that the blow was necessary to prevent further "crushing" of Branch.  Indeed, the jury evidently found appellant's use of the knife excessive to ward off the blows he himself (he said) was receiving from twin assailants and that caused him to "[bring] his hand around with the knife."

At the same time, however, this case is not *Fersner* because no one contends that appellant's use of lethal force disqualified him from defending Branch as a matter of law.[7]  The issue rather is the likely effect of misguidance the judge gave to a jury deciding whether there was evidence of that defense enough to create a reasonable doubt.[8]  The erroneous instruction, if obeyed, spared the jury the need to reach at all the issue of excessive force.  Even on appellant's version of the events, he argues, a jury knowing that Branch had assaulted Jachinma and (by Branch's own admission) prolonged the fight could have

---

6.  Consistent with the trial judge's reading of *Fersner,* on the issue of "amount of force permissible" he made clear to the jury that appellant's actual and reasonable belief that deadly force was needed would exonerate him, "even though afterwards it turns out that the appearances were false because either Mr. Lee or Mr. Branch was not actually in imminent danger or that deadly force was not necessary."

7.  *See also Graves,* 554 A.2d at 1149 (distinguishing *Fersner* on its facts and rejecting

argument that defendant forfeited the defense of another when he stabbed the victim once in the chest and killed him; "whether Graves could have repelled [the victim] in a nondeadly manner ... given ... his belief that his nearby wife and unborn child were in imminent danger of serious bodily harm is a question of fact for a properly instructed jury. . . .").

8.  The jury, we note, was given the court's instructions orally and in writing.

found that the Ukaomas—facing Branch's belligerent companions as well—had not exceeded the force necessary to repel Branch's aggression. That same jury would have heard appellant testify that he had not seen Branch begin the fight, yet could have found that point immaterial because they had been instructed that appellant's right to intervene depended on Branch's right to defend himself under circumstances as they appeared to him, not appellant. And, as stated earlier, the likelihood that the jury would find the Ukaomas' use of counter-force reasonable increased by every degree the jury tended to credit Branch's account of a continuing fight among equals. The jury thus may never have considered the question whether appellant, in the heat of a melee lasting only minutes, could have misapprehended—reasonably—the extent of Branch's danger in an assault that, from appellant's point of view, was unprovoked. As the prosecutor told the jury in summation, "Donald Branch was not entitled to use self-defense.... [N]o one was getting the better of him. He was crushing the Ukaomas," and "[b]ecause [Branch] was not entitled to use self-defense, [appellant] was not entitled to defend on his behalf."

In these circumstances, to surmise confidently that the jury passed over the required instructional step of assessing Branch's own right to self-defense and found that appellant had unreasonably used lethal force, remains just that: surmise. All told, we lack the "fair assurance, without stripping the erroneous [instruction] from the whole, that the judgment was not substantially swayed by the er-

ror." *Kotteakos,* 328 U.S. at 765, 66 S.Ct. 1239.

*Reversed and remanded.*[9]

---

9. The government does not separately dispute the point, but appellant's conviction for carrying a dangerous weapon must be reversed along with the conviction for voluntary manslaughter, given that the "dangerousness" of the weapon—the pocketknife—depended on the intended manner of its use. *See Wright v.*

*United States,* 926 A.2d 1151, 1155 (D.C. 2007). A jury accepting the defense of another person theory as a matter of reasonable doubt necessarily would have had the same doubt concerning appellant's manner of use of the knife.