*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 19-CF-914

DIANNA Y. LALCHAN, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF1-4987-13)

(Hon. Ronna L. Beck, Trial Judge)

(Argued June 1, 2022                                   Decided September 15, 2022)

*Daniel Gonen*, Public Defender Service, with whom *Samia Fam* and *Mikel-Meredith Weidman*, Public Defender Service, were on the brief, for appellant.

*Katherine M. Kelly*, Assistant United States Attorney, with whom *Matthew M. Graves*, United States Attorney, and *Chrisellen R. Kolb*, *Nicholas P. Coleman*, and *Cynthia G. Wright*, Assistant United States Attorneys, were on the brief, for appellee.

*Cindene Pezzell*, *William C. Perdue*, and *Sean A. Mirski* were on the brief for Organizations Against Domestic Violence, *amicus curiae* in support of appellant.

Before EASTERLY, MCLEESE, and HOWARD, *Associate Judges.*

MCLEESE, *Associate Judge*:  Appellant Dianna Y. Lalchan challenges her convictions for voluntary manslaughter while armed and possession of a firearm during a crime of violence.  We vacate and remand.

## I.  Factual Background

Certain basic facts were undisputed at trial.  Ms. Lalchan shot and killed her husband, Christopher Lalchan.  Ms. Lalchan fired three bullets, one of which hit a wall and one of which hit the floor.  When the final bullet was fired, Mr. Lalchan was facing Ms. Lalchan and moving forward.  That bullet, which was fatal, hit Mr. Lalchan in the back of the head.  Mr. Lalchan was near to the floor when he was struck by that bullet.  Ms. Lalchan was some distance away from Mr. Lalchan at the time of the fatal shot.

The dispute at trial was whether Ms. Lalchan acted with premeditated and deliberate malice or instead acted either in lawful self-defense or in good-faith but unreasonable self-defense.  The United States argued that Ms. Lalchan murdered Mr. Lalchan, mainly for financial and personal reasons surrounding their potential divorce.  In support of that argument, the United States relied on the fact that Mr. Lalchan had been shot in the back of the head.  The United States also elicited

evidence that Ms. Lalchan was the breadwinner in the relationship and was worried about having to pay Mr. Lalchan alimony and splitting their property after their divorce. The United States also elicited evidence that Ms. Lalchan had realized during the marriage that she was attracted to women, and she was concerned that Mr. Lalchan would tell Ms. Lalchan's conservative family about that.

Ms. Lalchan testified that she shot Mr. Lalchan because she feared for her life. In support of that testimony, Ms. Lalchan introduced the following evidence. Early in their relationship, Mr. Lalchan became angry and smashed items such as Ms. Lalchan's laptop. Mr. Lalchan's violent behavior later escalated to shoving and slapping. The abuse culminated in Mr. Lalchan strangling Ms. Lalchan on several occasions.

The first two times Mr. Lalchan strangled Ms. Lalchan occurred during arguments. Before he strangled her, Mr. Lalchan's demeanor would suddenly change: he became quiet, shut down emotionally, and focused intently on stopping himself from exploding. Ms. Lalchan described that change as "like the Hulk" (the Marvel Comics character) when he is trying to hold himself back. In two of the incidents, Mr. Lalchan strangled Ms. Lalchan until she passed out.

Mr. Lalchan strangled Ms. Lalchan a third time about two months before the shooting. In that incident, Mr. Lalchan lifted Ms. Lalchan by the neck with one hand while holding a gun with the other. Mr. Lalchan threw Ms. Lalchan into a wall and hit her with the gun. After that incident, Ms. Lalchan began looking into getting a divorce.

On the night of the shooting, the Lalchans were arguing about the possibility of divorce. Mr. Lalchan threw a bicycle, punched a television, grabbed his gun, and threatened to commit suicide. Ms. Lalchan got the gun and put it down, but the argument continued. Mr. Lalchan raised a mop handle over his head, threatening Ms. Lalchan with it. Ms. Lalchan grabbed the mop handle, and the two tussled over it. Eventually, Ms. Lalchan let Mr. Lalchan know that "this was it" and that he would not have any more chances. Mr. Lalchan said, "Do I need to shut you up?" He then shut down like he had before and came at Ms. Lalchan. Fearing that Mr. Lalchan might kill her, Ms. Lalchan grabbed the gun and shot Mr. Lalchan.

Ms. Lalchan introduced evidence that she had told others about Mr. Lalchan's physical abuse. She also introduced evidence, including photographs, of injuries that she testified were caused by the abuse.

Dr. Mary Ann Dutton, a clinical psychologist specializing in domestic violence, testified as a defense expert. In brief, she testified as follows. Dr. Dutton focused her testimony more specifically on violence between intimate partners. She testified that "Battered Woman Syndrome" is a legal term, not a diagnosis of a psychological disorder. She also discussed a number of common misconceptions that people have about women who have been battered, including that such women are usually unemployed, meek, and financially dependent.

Dr. Dutton testified that intimate-partner violence commonly escalates over time. Battered women often do not leave or report abuse, because they are embarrassed, fear that such steps might make the abuse worse, or hope that things will improve. Battered women who try to leave the relationship are at particularly high risk, facing a risk of abuse approximately four times greater than that faced by women who remain in the relationship. A woman who has previously been strangled is seven times more likely to be killed than a woman who has not previously been strangled.

Dr. Dutton further testified that people who have suffered intimate-partner violence learn to identify cues indicating that violence is about to occur, such as a look or a tone of voice. Over time, such cues can become all that is needed to put

people who have suffered life-threatening abuse in fear for their lives. Such cues can cause an automatic response leading the person to fight back or flee.

The jury acquitted Ms. Lalchan of first-degree murder and second-degree murder but found her guilty of voluntary manslaughter while armed and possession of a firearm during a crime of violence.

## II. Denial of the Requested Instruction

Ms. Lalchan argues that the trial court committed reversible error by declining to instruct the jury that it could consider the effects of battery in assessing whether Ms. Lalchan's perception of danger was objectively reasonable. We agree.

### A. Procedural Background

Ms. Lalchan asked the trial court to instruct the jury that, in determining whether Ms. Lalchan acted in lawful self-defense, the jury should consider whether Ms. Lalchan acted as a "reasonable woman with a history of trauma and the effects of battery." The trial court denied the motion, concluding that the evidence that Ms. Lalchan suffered effects from prior battery could be considered in determining

whether Ms. Lalchan subjectively perceived danger but had no bearing on whether Ms. Lalchan's perception was objectively reasonable. In the trial court's view, permitting such evidence to be considered on the issue of objective reasonableness would be contrary to this jurisdiction's rejection of the defense of "diminished capacity." *E.g.*, *Bethea v. United States*, 365 A.2d 64, 83-92 (D.C. 1976).

## B. Standard of Review

"[W]e review de novo whether challenged jury instructions adequately state the law." *Fleming v. United States*, 224 A.3d 213, 219 (D.C. 2020) (en banc). The "refusal to grant a request for a particular instruction is not a ground for reversal if the court's charge, considered as a whole, fairly and accurately states the applicable law." *Fearwell v. United States*, 886 A.2d 95, 101 (D.C. 2005) (internal quotation marks omitted). "[A] special instruction is warranted when there is evidence of special facts sustaining a rational defensive theory." *Id.* at 100 (brackets and internal quotation marks omitted).

## C. Analysis of the Trial Court's Ruling

As we have previously noted, the trial court concluded that evidence of the effects of battery was not admissible to show that Ms. Lalchan's perception of danger was objectively reasonable. The United States does not defend that ruling as correct. We conclude that the trial court's ruling was incorrect.

Deadly force may lawfully be used in self-defense only if the defendant "actually believe[s] and reasonably believe[s] that [the defendant was] in imminent peril of death or serious bodily harm." *Dawkins v. United States*, 189 A.3d 223, 232 (D.C. 2018) (internal quotation marks omitted). The "right of self-defense, and especially the degree of force [that a person] is permitted to use to prevent bodily harm, is premised substantially on the [person's] own reasonable perceptions of what is happening." *Fersner v. United States*, 482 A.2d 387, 391 (D.C. 1984). Such perceptions may include "an enhanced sense of peril based on personal knowledge that the attacker has committed prior acts of violence." *Id.* (internal quotation marks omitted). We have therefore "recognized the relevance of expert testimony relating to battered woman's syndrome . . . to establish the reasonableness of a complainant's fear in a case where the complainant claims self-defense to a charge of violence against [the complainant's] abuser." *Earl v. United States*, 932 A.2d 1122, 1128

(D.C. 2007) (internal quotation marks omitted). We see no basis for a different conclusion where, as in the present case, a defendant is relying on such evidence in support of a claim of self-defense. *See Parker v. United States*, 155 A.3d 835, 852 (D.C. 2017) (Ferren, J., concurring) ("[I]n the case of a 'battered spouse' defense, a wife's misperception that her husband was imminently threatening her life might justify a finding that her stabbing him was reasonable under the circumstances."); *see also, e.g.*, *State v. Elzey*, 244 A.3d 1068, 1083 (Md. 2021) ("The cyclical nature of an intimate battering relationship enables a battered spouse to become an expert at recognizing the warning signs of an impending assault from [the abuser]—signs frequently imperceptible to outsiders. For some victims, the sign may be 'that look in the eye' . . . .") (internal quotation marks omitted); *United States v. Lopez*, 913 F.3d 807, 822 (9th Cir. 2019) ("Fear which would be irrational in one set of circumstances may be well-grounded if the experience of the defendant with those applying the threat is such that the defendant can reasonably anticipate being harmed on failure to comply.") (emphasis and internal quotation marks omitted); *see generally, e.g.*, *Mathews v. United States*, 539 A.2d 1092, 1093 (D.C. 1988) (per curiam) (evidence of "defendant's life experience and background as it bears on [defendant's] rational perceptions" is relevant to objective reasonableness of action allegedly taken in self-defense).

In denying the requested instruction, the trial court indicated that the instruction would be contrary to this jurisdiction's prohibition of diminished-capacity defenses. We disagree. We have formulated the concept of diminished capacity in a variety of ways. *See, e.g.*, *Jackson v. United States*, 76 A.3d 920, 933-36 (D.C. 2013) (discussing various formulations). One common thread in those formulations is that diminished-capacity defenses rely on the idea that the defendant suffers from a mental "abnormality" that falls short of legal insanity. *Id.* In the present case, however, Dr. Dutton made clear that she was not testifying that Ms. Lalchan was suffering from a mental abnormality or illness. Rather, Dr. Dutton explained that persons who have been subjected to intimate-partner abuse can learn, both consciously and unconsciously, to perceive signs that such abuse may be coming, just as children can learn to sense from facial cues that their parents are very upset with them. Persons who have been subjected to intimate-partner abuse also can develop automatic responses to such signs, through the process of conditioned learning. These are ordinary human reactions, not an abnormal mental state or disorder. Dr. Dutton's testimony thus did not run afoul of the prohibition on introducing evidence of diminished capacity. *Cf. Jackson*, 76 A.3d at 935 (prohibition on diminished-capacity defenses does not "sweep in . . . defenses that have nothing to do with a claim of diminished capacity") (citing *Ibn-Tamas v. United*

*States*, 407 A.2d 626, 631-40 (D.C. 1976) (expert testimony about battered-women syndrome was potentially admissible on issue of self-defense)).

## D.  Alternative Grounds for Affirmance

The United States argues that the trial court's ruling can be affirmed on four alternative grounds.  In appropriate circumstances, this court can affirm a trial court's ruling on a ground not relied upon by the trial court. *E.g.*, *Randolph v. United States*, 882 A.2d 210, 218 (D.C. 2005).  That principle has limits, however.  We must be sure to avoid procedural unfairness, and we may not disregard the discretionary authority of the trial court. *Id.* at 218-19.  We are not persuaded by the alternative grounds for affirmance presented by the United States.

### 1.  Wording of the Defense Request

The United States argues that the requested instruction was vague, poorly worded, and slanted toward the defense.  The United States did not make those arguments in the trial court, and they were not the basis of the trial court's ruling.  If the United States had made those arguments in the trial court, the defense and the trial court would have had the opportunity to address them, making any necessary

revisions.  *Cf., e.g.*, *Stack v. United States*, 519 A.2d 147, 156 (D.C. 1986) ("Assuming, as the government suggests, that the first paragraph of the requested instruction would have unduly emphasized the defense version of the evidence, the judge easily could have made appropriate modifications.").

In requesting the instruction, the defense adequately drew the trial court's attention to the legal principle on which the defense was relying:  expert testimony about battery and its effects was relevant to the objective reasonableness of Ms. Lalchan's conduct.  The trial court denied the request not because of issues with the wording of the requested instruction but rather because the trial court believed— incorrectly, in our view—that the request rested on a legally invalid theory.  We conclude that it would be procedurally unfair to affirm the trial court's ruling on the basis of perceived deficiencies in the precise wording of the requested instruction. *See, e.g.*, *Pannu v. Jacobson*, 909 A.2d 178, 197 (D.C. 2006) ("Even though a trial court is under no obligation to give any particular requested instruction, if the request directs the court's attention to a point upon which an instruction to the jury would be helpful, the court's error in failing to charge may not be excused by technical defects in the request.") (brackets and internal quotation marks omitted); *Whitaker v. United States*, 617 A.2d 499, 507-08 (D.C. 1992) (on rehearing) ("Assuming, without deciding, that defense counsel's proposed instruction was not phrased with

sufficient precision, and that it ought not to have been given in counsel's exact words, this did not obviate the necessity for some effective reinstruction . . . .").

For essentially the same reasons, we are not persuaded by the United States's argument that the defense's request did not suffice to preserve for appeal the arguments that Ms. Lalchan advances in this court.

## 2. Lack of a Diagnosis

The United States suggests that the evidence did not support the requested instruction, because Dr. Dutton never diagnosed Ms. Lalchan with battered-woman syndrome. We disagree. Dr. Dutton explained that she was not testifying about a diagnosed mental illness, but rather was testifying about intimate-partner violence and its common effects. In any event, we have previously held that Dr. Dutton's testimony about battered-woman syndrome, offered in a different case on behalf of the prosecution, was admissible even though Dr. Dutton had not examined or diagnosed the complaining witness. *Nixon v. United States*, 728 A.2d 582, 591-95 (D.C. 1999). We see no basis for a different conclusion here.

### 3. Other Instructions

The United States argues that other instructions adequately communicated the relevant law to the jury. We conclude to the contrary.

The trial court's instructions to the jury stated that self-defense applied if Ms. Lalchan "actually believed that she was in danger of serious bodily injury and actually believed that the use of deadly force was necessary to defend against that danger and both of those beliefs were reasonable." The instructions further explained that the question was whether Ms. Lalchan, "under the circumstances as they appeared to her at the time of the incident, actually believed she was in imminent danger of bodily harm and could reasonably hold that belief." Finally, the instructions informed the jury that evidence of "past acts of violence" by Mr. Lachlan could bear on the "reasonableness" of Ms. Lalchan's "fear for her safety."

In our view, the instructions as a whole did not adequately explain to the jury that the objective reasonableness of Ms. Lalchan's conduct could be understood in light of the effects of any prior abuse on Ms. Lalchan's perceptions at the time of the incident. In fact, it would be quite surprising if the instructions as a whole communicated that principle to the jury. In denying the defense request, the trial

court held that the requested instruction was contrary to law. Presumably, the trial court did not intend the instructions to communicate a principle that the trial court believed was legally incorrect.

We hold that a specific instruction on the effect that intimate-partner violence can have on reasonable perceptions of danger was required in the circumstances of this case. *See, e.g.*, *Smith v. State*, 486 S.E.2d 819, 823 (Ga. 1997) ("We take this opportunity to announce the rule that when a battered person syndrome self-defense claim has been properly established, the court should give specific jury instructions on justification by self-defense which are tailored to explain how the defendant's experiences as a battered person affected that defendant's state of mind at the time of the killing."); *State v. Gartland*, 694 A.2d 564, 575 (N.J. 1997) (per curiam) ("The charge on self-defense should . . . have been tailored to the circumstances of the case. . . . At a minimum, the jury . . . should have been asked to consider whether, if it found such to be the case, a reasonable woman who had been the victim of years of domestic violence would have reasonably perceived on this occasion that the use of deadly force was necessary to protect herself from serious bodily injury.").

## 4. Harmless Error

The United States argues that the denial of the requested instruction was harmless. We disagree.

The parties dispute whether harmlessness should be assessed under the standard generally applicable to constitutional errors or the less-stringent standard applicable to non-constitutional errors. *Compare Chapman v. California*, 386 U.S. 18, 23-24 (1967), *with Kotteakos v. United States*, 328 U.S. 750, 764-65 (1946). We need not address that issue, because we hold that the failure to give the requested instruction was harmful under the *Kotteakos* standard. To hold a non-constitutional error harmless, we "must find it *highly probable* that the error did not contribute to the verdict." *Moghalu v. United States*, 263 A.3d 462, 472 (D.C. 2021) (brackets and internal quotation marks omitted). We are unable to make such a finding in this case.

Ms. Lalchan's sole defense was that she shot Mr. Lalchan in self-defense. The acquittals indicate that the jury accepted that Ms. Lalchan may have acted out of a subjective fear of injury, rather than with premeditation or unmitigated malice. The guilty verdict on manslaughter, however, indicates that the jury concluded that Ms.

Lalchan did not have an objectively reasonable fear of injury. For the reasons we have explained, the denial of the requested instruction left the jury without adequate guidance about the potential relevance of Dr. Dutton's testimony to that issue.

In arguing that any error on this point was harmless, the United States asserts that defense counsel was able to argue to the jury in closing argument that Dr. Dutton's testimony about the effects of intimate-partner abuse was relevant to the objective reasonableness of Ms. Lalchan's conduct. We note to the contrary that defense counsel never explicitly asserted that point to the jury, presumably because the trial court had ruled that the law was otherwise. In any event, even if defense counsel had conveyed the point in closing arguments, there is a critical difference between instructions from the court and the arguments of counsel. *See, e.g.*, *Stack*, 519 A.2d at 156 (defense counsel's ability to argue point "to the jury in closing does not cure the [instructional] error since the jury must be instructed on the legal principles which are to guide its deliberations, and the court has the obligation to state those principles in the instructions"); *see also Boyde v. California*, 494 U.S. 370, 384 (1990) ("[A]rguments of counsel generally carry less weight with a jury than do instructions from the court. The former . . . are likely viewed as the statements of advocates; the latter . . . are viewed as definitive and binding statements of the law."); *Carter v. Kentucky*, 450 U.S. 288, 304 (1981) ("Arguments

of counsel cannot substitute for instructions by the court.") (brackets and internal quotation marks omitted).

In sum, we conclude that the refusal to give the requested instruction was harmful error.

## III. Other Issues

We briefly discuss two additional issues that might arise in any retrial. Both issues involve the trial court's overruling of objections to the prosecutor's closing argument. First, Ms. Lalchan challenges the prosecutor's comment that it was unclear when certain photographs introduced by Ms. Lalchan had been taken, because those photographs, as admitted into evidence, lacked metadata indicating their date. Ms. Lalchan represented in the trial court that the photographs, as provided to the United States in discovery, contained such metadata. The United States has not disputed that representation. We agree that this comment was impermissible. *See, e.g.*, *Powell v. United States*, 880 A.2d 248, 258 n.23 (D.C. 2005) (reminding prosecutors "to guard against inviting inferences of fact arguably contrary to evidence of which they are aware but which is not of record in a case").

Second, Ms. Lalchan objects to the prosecutor's suggestion that Ms. Lalchan's testimony referring to the Hulk was the product of coaching by defense counsel. Specifically, the prosecutor argued,

> [O]ne of the things that you won't hear . . . [in Ms. Lalchan's statement to the police] is . . . the word Hulk. That is a new creation. . . . . Now, you had a chance to see [Ms. Lalchan] on the stand when she was testifying. And, when she testified for the defense, after she'd been rehearsed and practiced and talked to . . . .

We agree that this argument was impermissible. *See, e.g.*, *Diaz v. United States*, 716 A.2d 173, 180 (D.C. 1998) (concluding that prosecutor impermissibly urged jury to draw adverse inference from defendant's exercise of right to counsel, where prosecutor argued that defendant made story up after "consultation with his attorney to tell you the story that he told you here today") (brackets, ellipses, and internal quotation marks omitted).

For the foregoing reasons, we vacate the judgment of the Superior Court and remand the case for further proceedings.

*So ordered*.